SKIBS A/S GYLFE, as Successor in Interest to Tankrederiet Gefion A/S, as Owner of the **MOTORSHIP GYDA**, et al., Plaintiffs,

v.

HYMAN-MICHAELS COMPANY and Lakes Shipping & Trading Corporation, Defendants and Third-Party Plaintiffs,

v.

NATIONAL CARGO BUREAU, INC., Third-Party Defendant.

SKIBS A/S GYLFE, as Successor in Interest to Tankrederiet Gefion A/S, as Owner of the Motorship Gyda, Plaintiffs,

v.

MICHIGAN FOUNDRY SUPPLY COMPANY, Inc., Defendant and Third-Party Plaintiff,

v.

NATIONAL CARGO BUREAU, INC., Third-Party Defendant.

SKIBS A/S GYLFE, as Successor in Interest to Tankrederiet Gefion A/S, as Owner of the Motorship Gyda, et al., Plaintiffs,

v.

NATIONAL CARGO BUREAU, INC., and G. P. Sullivan, Defendants and Third-Party Plaintiffs,

v.

HYMAN-MICHAELS, Lakes Shipping & Trading Corporation, Michigan Foundry Supply Company, Inc., and Erickson Trucking Service, Third-Party Defendants.

SKIBS A/S GYLFE, as Successor in Interest to Tankrederiet Gefion A/S, as Owner of the Motorship Gyda, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 23990, 23991, 25386 and 23964.

United States District Court
E. D. Michigan, S. D.
Sept. 4, 1969.

Foster, Meadows & Ballard, Detroit, Mich., Haight, Gardner, Poor & Havens, New York City, for plaintiffs.

Donald J. Miller, of Lucking, Van Auken & Miller, Detroit, Mich., Krusen, Evans & Byrne, Philadelphia, Pa., for Hyman-Michaels Co. and Lakes Shipping & Trading Corp.

Vandeveer, Haggerty, Doelle, Garzia, Tonkin & Kerr, Alexander, Buchanan & Conklin, Detroit, Mich., for Michigan Foundry Supply Co., Inc., National Cargo Bureau, Inc., and Erickson Trucking Service, Inc.

OPINION

FREEMAN, Chief Judge.

On July 8, 1961, the Norwegian Motorship Gyda, carrying a shipment of steel turnings consigned to Mitsubishi, a Japanese company, arrived in Philadelphia and was required to anchor in the explosives anchorage due to the spontaneous heating of her cargo. On July 14, unloading of the turnings commenced, and extensive fires resulted. Substantial damage was sustained by the ship as well as the cargo. As a consequence, eleven suits, many with cross-claims and third-party claims, were filed—ten by the owner of the ship and its underwriters and one by the owner of the cargo and its underwriters. Prior to trial, four of these suits were dismissed for various reasons. The remaining seven actions

were consolidated for trial, which proceeded only on the liability issues pursuant to an agreed order of severance of the damage issues. All seven cases were tried simultaneously commencing June 18, 1968. Six of the actions were non-jury admiralty cases brought by the shipowner plaintiffs. The other suit brought by the cargo plaintiffs was a civil jury action.

During the trial, this court dismissed the shipowner's suit against Erickson Trucking Service (26543), and one of two of the shipowner's suits against the United States (26162). The jury returned its verdict in the cargo civil case on April 14, 1969. Consequently, this court is now concerned only with the remaining four cases, Nos. 23990, 23991, 25386, and 23964.

Admiralty No. 23990 involves a suit by the shipowner against Hyman-Michaels Company and Lakes Shipping and Trading Corporation, who have third-party complaints against the National Cargo Bureau, seeking indemnity and contribution.

Admiralty No. 23991 involves a suit by the shipowner against Michigan Foundry Supply Company, which has a third-party complaint against National Cargo Bureau, seeking indemnity and contribution.

Admiralty No. 25386 involves a suit by the shipowner against National Cargo Bureau, who has a third-party complaint against Hyman-Michaels, Lakes Shipping and Trading, Michigan Foundry and Erickson Trucking Service, seeking indemnity and contribution.

Admiralty No. 23964 involves a suit by the shipowner against the United States for alleged negligence of the Coast Guard. No third-party complaint is involved.

During the course of the trial, the defendants in Nos. 23990 and 23991 settled with the shipowner plaintiffs. The only issues now remaining for determination in these cases are those of the liability of the third-party defendant, National Cargo Bureau, to the third-party plaintiffs, Hyman-Michaels, Lakes Shipping, and Michigan Foundry, for indemnity and contribution. As a result of the settlement, third-party plaintiffs in those cases must prove their actual liability to the shipowner plaintiffs [1] and establish the requisite fault on the part of the third-party defendant, National Cargo Bureau.

On February 6, 1961, Hyman-Michaels Company, of Chicago, a dealer in scrap metal, purchased 5,000 to 6,000 tons of "clean, heavy, steel turnings free of borings" from the Michigan Foundry Supply Company, of Muskegon, Michigan, also a scrap metal dealer. The contract of purchase provided that the price of the turnings was F.O.B. "Loaded, stowed and trimmed, Vessel your Dock, Muskegon, Mich." [Exhibit McDonald-1].

On March 21, 1961, Lakes Shipping and Trading Corporation, a wholly owned subsidiary of Hyman-Michaels, entered into a voyage charter for the Motorship Gyda [2] with its time charterer, Roroto S.A., a Panamanian corporation. The voyage contemplated by the charter was from the Great Lakes to Japan, with one or two intermediate stops. [Exhibit Diamond-4].

On April 22, 1961, Mitsubishi entered into a contract with Hyman-Michaels to purchase 5,500 long tons of shoveling turnings, per specifications of the Institute of Scrap Iron and Steel, Inc. [Exhibit Cargo-1].

---

1. See Tankrederiet Gefion A/S, etc. v. Hyman-Michaels Co., 406 F.2d 1039 (6th Cir. 1969), (an interlocutory appeal taken in these cases during the trial).

2. The Gyda was owned by Tankrederiet Gefion A/S, a Norwegian corporation. On October 1, 1964, Tankrederiet Gefion was merged into Skibs A/S Gylfe. During the trial, Skibs A/S Gylfe was substituted for Tankrederiet Gefion A/S as plaintiff in the ship cases.

On May 31, 1961, Hyman-Michaels engaged the National Cargo Bureau [3] (NCB) to render certain services in connection with this shipment of steel turnings. The precise nature and extent of these services are in dispute and will be dealt with later in this opinion. It is sufficient for the present to note that NCB agreed to make an on hire survey in Muskegon, to perform draft surveys in Muskegon and Detroit, and to issue its "A Certificate" if the loading and stowage of the turnings conformed to applicable Coast Guard regulations. Hyman-Michaels also informed Michigan Foundry that a surveyor from NCB would be present at the time of loading.

On June 14, 1961, the Gyda arrived at Michigan Foundry's dock in Muskegon. Captain Lewis (a surveyor from National Cargo Bureau), John Kis (in charge of Hyman-Michaels export scrap steel), Donald Klein (an employee of Michigan Foundry), and Captain Hemmick (the ship's agent) were there to meet it. A few hours later, after Captain Lewis had performed the on hire survey and the pre-loading portion of the draft survey, loading commenced and continued on a 24-hour per day basis until it was completed in the early morning hours of June 18. The turnings were loaded into holds 2, 3, 4, and two deep tanks of the ship.

Immediately prior to loading, Captain Lewis, accompanied by the Gyda's First Mate, Jakobson, and others, took temperatures of the pile of turnings on the dock. During most of the time the Gyda was being loaded, Captain Lewis was absent from Muskegon. However, on June 18, prior to the ship's sailing, he had returned and conferred with Jakobson relative to the temperatures which Jakobson had found in the turnings on

the ship during loading. [Exhibit Jakobson-3]. Captain Lewis also took a series of temperature readings of the cargo in each of the holds of the ship at this time. He then conferred with the Master in the presence of the First Mate, Kis, Hemmick, and perhaps others. What was said at that time is also in dispute.

Shortly after this conference on the 18th, the Gyda sailed for Detroit and arrived there in the early morning of June 20. No temperatures were taken of the cargo of turnings during the voyage to Detroit. At 1:45 p. m. on the 20th, the ship docked at Nicholson Terminal in Detroit to load additional cargo (scrap iron) in holds 1 and 5.

After the Gyda left Muskegon, Lewis called Captain Sullivan, NCB's surveyor in Detroit, and told him the ship was coming and that the cargo was hot. Captain Roscoe, of NCB in Chicago, also called Sullivan prior to the Gyda's arrival in Detroit and instructed Sullivan to check the temperatures aboard the Gyda when he performed his draft survey. Roscoe also told Sullivan to report the situation to the Coast Guard if the cargo temperatures were over 130° F.

Captain Sullivan boarded the Gyda at 2:10 p. m. on June 20. After performing the pre-loading portion of the draft survey, he took temperatures in the cargo.[4] He found some temperatures well over 130° F. After leaving the ship, Sullivan contacted Chief Bosun's Mate, Sommer, of the Coast Guard at 6:10 p. m. and informed him of the temperatures. Sommer, in turn, notified his superior, Captain Malloch, Captain of the Port of Detroit, United States Coast Guard, about the heating problem on the Gyda. Malloch instructed him to keep track of the temperatures. Sommer

---

3. National Cargo Bureau, the principal third-party defendant in two of these cases and a defendant and third-party plaintiff in a third case, is a corporation organized as a successor to the Boards of Underwriters of New York and San Francisco to provide various services to the shipping industry, including inspection at loading ports for safe loading and stowage.

4. Henceforth, the term "cargo" will refer only to the steel turnings loaded in Muskegon. These were in holds 2, 3, 4, and both deep tanks.

made an informal visit to the ship that evening.

The next morning, June 21, Sommer boarded the ship and was there when Sullivan took further temperatures of the cargo. Some of these temperatures were also well above 130° F. and Sommer reported them to Captain Malloch. Later in the day, Sullivan received other readings that had been taken. These readings showed temperatures as high as 198° (Exhibit Sullivan-5B).

On June 22, Sullivan boarded the Gyda for the last time. He obtained temperature readings as high as 196° F. After leaving the ship, Sullivan consulted with Captain Malloch and agreed to keep the Coast Guard informed of the temperatures on the Gyda. It was also agreed that Sullivan would record these temperatures from the ship's log rather than take them personally.

On June 23, the ship went to anchor in the Detroit River. The temperatures found in the ship's cargo thereafter were reported to Sullivan by the Master, Kis, or the ship's agent. Sullivan kept Roscoe and the Coast Guard informed of the temperature levels. This procedure continued until June 29, the day of the ship's departure from Detroit.

On June 26, Mr. Wright, a metallurgist, came aboard the Gyda to inspect the cargo at the request of Hyman-Michaels. Wright visually inspected the cargo and took temperatures in each hold. He testified that the turnings in the deep tanks were loose, while those in the holds were packed. He said that he saw the usual bits of rags, paper, and splinters but that such debris was not excessive. It is evident that the temperatures he found were not uniform even within a given hold. What advice he gave the Master, if any, or Kis is in dispute. In any event, Wright left the Gyda on the 26th and did not return.

No further action was taken with respect to the Gyda's cargo until June 29. On the morning of the 29th, Harlow Meno, a marine surveyor, representing Scandinavian Marine Claims (SMC), the underwriter's agent, boarded the ship to inspect the cargo. He testified that following his inspection he told the Master that there was nothing unusual about the cargo in No. 2 and No. 4 holds and that they and the deep tanks were all right. However, he did say that he told the Master the turnings in No. 3 hold presented a problem and were unstable. He had found an oil haze and generally higher temperatures in No. 3 hold than elsewhere. He concluded that there were hot spots in No. 3.

After his inspection and after talking to the Master, Meno went ashore and found that arrangements could be made to discharge the cargo in No. 3 hold if that were desired. He then called Mr. Molvig of SMC in New York and reported all of the above to him. Molvig told Meno to continue watching the ship and report back.

That afternoon Meno returned to the ship and again inspected the cargo. His findings were unchanged. He so informed the Master and also told him that arrangements could be made to discharge the cargo. Meno left the ship about 3:30 or 4:00. The Gyda sailed shortly after 5:00.

After the ship sailed from Detroit, the First Mate continued to take temperatures. [Exhibit Jakobson-4]. By the time the ship neared Montreal, the wooden sheathing along the bulkhead between No. 3 hold and the engineroom had begun to char, and smoke was coming out of No. 3 hatch. Also, the engineroom side of the bulkhead at No. 3 hold was hot in places. Temperatures taken with two thermometers on that bulkhead about four feet above the engineroom floor indicated 140° and 180° F. The Master decided to stop at Montreal and have surveyors check the cargo.

On July 2, when the ship anchored at Montreal, George Hayes, a marine surveyor representing the underwriters, and Edward Edwardson, a marine engineer acting on behalf of Hyman-Michaels and Lakes Shipping, boarded the ship. Kis, of Hyman-Michaels, was also present.

Hayes testified that when he started digging into the cargo in No. 3, a small fire resulted that was about a foot in diameter. This was extinguished. Hayes also noted that the bulkhead between No. 3 hold and the engineroom was slightly buckled or warped.

All present agreed that it was necessary to lower the temperatures of the engineroom bulkhead and decided to achieve this by spraying water against the bulkhead on the side of No. 3 hold. After such spraying, the temperatures of the bulkhead dropped to 120° F. and 135° F. on July 3. Nevertheless, the Master ordered fuel oil in the tanks under No. 3 hold to be shifted because he feared an explosion. The surveyors, the Master, and Kis agreed that it was prudent for the ship to leave Montreal for Philadelphia and it sailed on July 3.

Since the temperatures in all holds and the deep tanks were near or over 200° F., when unloading began in Philadelphia on July 14, some further observations are in order. When the ship left Detroit on June 29, the temperatures in No. 2 hold and the deep tanks had been steadily declining for several days and (with one exception in the starboard deep tank) were all below 130° F.; they remained below 130° F. until after July 4. The temperatures in No. 4 hold were clearly dropping by the time the ship left Detroit and stabilized under 130° F. on July 3. However, there was a sudden increase in temperatures in No. 2 and No. 4 holds and the deep tanks around July 6 and 7.

When the Gyda arrived in Philadelphia on July 8, she was boarded by representatives of the Coast Guard and National Cargo Bureau. Temperatures in holds 3 and 4 were then quite high and were rising in hold 2 and the deep tanks. The ship was denied permission to dock and ordered to drop anchor at the explosives anchorage.

On July 11, Mr. Midtboe of Norwegian Veritas, representing the shipowner, surveyed the ship's structure and declared the ship unseaworthy with the cargo aboard. On July 14, the ship was permitted to dock, and discharging of the cargo began. Fires resulted and caused substantial damage to both the ship and its cargo.

I

## THE SCOPE OF NATIONAL CARGO BUREAU'S UNDERTAKING

Hyman-Michaels engaged the National Cargo Bureau to render certain services in connection with this shipment of steel turnings. The scope of NCB's undertaking is in dispute.

On May 31, Mr. Diamond, Traffic Manager of Hyman-Michaels, telephoned Captain Roscoe, of the National Cargo Bureau, who was in charge of the Bureau's operations in the Great Lakes area and had his office in Chicago. Regarding this conversation, Diamond testified he told Roscoe that he was aware that turnings had a tendency to heat and asked what NCB could do to help. Diamond further stated that Roscoe told him of the relevant Coast Guard regulations covering turnings, and that NCB would issue an "A Certificate" if the loading was in compliance with these regulations. Diamond said he was also told that the A Certificate would cost between $100 and $150 and that he requested Roscoe to have such a certificate issued to Hyman-Michaels upon completion of the loading.

The following day, June 1, Diamond wrote a letter [5] to Roscoe confirming the telephone conversation of the previous day and outlining the services that Hyman-Michaels wished NCB to perform relative to loading the Gyda. [Exhibit Lewis–6]. In this letter Diamond requested NCB to undertake three functions relevant to these suits:

" * * * As usual, we would like you to make an On Hire Survey on this ship which was built in 1960. In this connection, we would like you to particularly check the deep tanks and as-

---

5. The letter was dictated by Diamond although it was signed by T. E. Neary, Diamond's assistant.

certain whether the sheathing of the coils is sufficient to withstand the weight of the material which will be loaded into these tanks. Although the sheathing is for the owner's account, and he was aware of the cargo to be loaded, nevertheless, we do not want any damage to occur.

"* * * give * * * an opinion as to the character of the stowage.

"* * * please oversee the loading of this cargo for the purpose of compliance with the rules and regulations of the U. S. Coast Guard and for the protection of the interest of the insurance underwriters."

At the same time, Diamond also wrote a letter [6] to Michigan Foundry informing it that NCB had been hired [Exhibit McDonald–3] and therein stated:

"The following are some details which we ask you to attend to, or that you should be aware of:

"1. The vessel will be surveyed as to the condition of its cargo spaces by the National Cargo Bureau. This is called an On Hire Survey and is for the protection of the stevedores. We ask that you agree to share this cost with us. Your share would amount to $53."

* * * * * *

"3. The third function of the National Cargo Bureau with reference to this loading will be to see that the cargo complies with the fire and safety regulations of the U. S. Coast Guard and the U. S. statutes. The Bureau will issue its 'A Certificate' if there is compliance. As you know, the principal danger is that of overheating and fire, and we hope this will be prevented. The Bureau will call upon the Coast Guard, should they find it necessary. I hope it will not be necessary."

A copy of the letter to Captain Roscoe was also sent to Michigan Foundry, but a copy of Diamond's letter to Michigan Foundry was not sent to Roscoe or anyone else connected with NCB. Since the undertaking by NCB as indicated by such telephone conversation and correspondence was indefinite and uncertain, the court also considered the action of the parties themselves as agreed evidence of what they understood the undertaking to be.

After the Gyda sailed from Muskegon, both Captain Lewis, the NCB surveyor sent to Muskegon, and Captain Roscoe, in Chicago, telephoned Captain Sullivan, the NCB surveyor in Detroit, to warn him that the Gyda was sailing. Captain Roscoe also instructed him to take temperatures of the Gyda's cargo and to inform the Coast Guard if they exceeded 130° F.

In Detroit, Captain Sullivan did find the temperatures well in excess of the 130° F. and so informed the Coast Guard. Sullivan continued to receive temperature readings of the cargo from the Master, Kis, or the ship's agent by daily telephone reports of temperatures recorded in the ship's log. This procedure continued until June 29 when the ship sailed. During this period, Sullivan not only kept Captain Malloch of the Coast Guard informed of the temperatures reported to him, but also informed Captain Roscoe, of NCB, in Chicago. NCB did not issue its A Certificate until a few days after the ship left Detroit.

The court has concluded from this evidence that National Cargo Bureau's undertaking was limited to activities in Muskegon. It has been argued by Hyman-Michaels, Michigan Foundry, and the ship plaintiffs (the latter two claiming to be third-party beneficiaries of this contract) that National Cargo Bureau undertook to determine when it would be safe for the ship to sail from Detroit, but, with respect to this contention, they have not met their burden of proof. It will be seen that Diamond's testimony, summarized above, and especially the two letters, one to National Cargo Bureau and the other to Michigan Foundry, written the following day, refer only to the *loading* of the Gyda. All of the

---

6. Again, the letter was signed by Neary.

negotiations and written confirmation of the oral discussion appear to have contemplated activities by National Cargo Bureau, relating to the cargo of steel turnings, only at the time of loading—which occurred at Muskegon. The A Certificate itself certified only that the Gyda

> " * * * has been under the inspection of a surveyor * * * of the National Cargo Bureau, Inc., at this port from time to time during the course and in respect of the *loading* of cargo herein below specified; that so far as it came under the observation of such surveyor * * *, the stowage of dangerous cargo * * * was in accordance with the regulations of the Commandant, United States Coast Guard * * *." [Emphasis added.]

It is true that National Cargo Bureau withheld the issuance of the A Certificate pending a downward trend in the temperatures. Captain Anderson, the Deputy Chief Surveyor of National Cargo Bureau in 1961, testified that this was a general policy of NCB. Interestingly, there is no evidence in this record that Hyman-Michaels was in any way aware of this policy at the time of contracting with National Cargo Bureau. To conclude that National Cargo Bureau must have agreed or undertaken to take temperatures in Detroit or determine when it would be safe for the ship to continue its voyage from there or to issue its A Certificate only upon a downward trend of the temperatures simply because it did in fact take temperatures and withhold the A Certificate cannot be justified on this record. The contract, whatever its terms, was entered into not later than June 1. Diamond wrote two letters on that date indicating his understanding of what he was hiring National Cargo Bureau to do. One of these letters was sent to National Cargo Bureau and the other to Michigan Foundry. In neither of these letters is there anything suggesting that National Cargo Bureau was to do anything relative to the cargo of steel turnings after it was loaded.

The court finds that National Cargo Bureau undertook to send a competent surveyor to Muskegon. The surveyor was required to determine prior to commencement of loading whether the holds of the ship were in proper condition to receive this cargo. He was to observe the loading through its entire course. He did not have to be at the ship continuously during the time it was being loaded, but was required under the contract to make periodic observations and to take temperatures of the turnings on the dock from time to time. He was also required to observe the material being loaded for debris and other combustible waste in order that he could give an intelligent and informed opinion as to the character of the stowage and to be reasonably available to Kis during the loading process in order to advise him as to whether the regulations were being complied with and whether the cargo was being stowed in a safe manner. If at the end of loading the Coast Guard regulations had been complied with, the Bureau was, of course, obligated to issue its A Certificate.

Nothing further was required of NCB in Muskegon, and it did not undertake any duties relative to the cargo of turnings after the ship left Muskegon.

Michigan Foundry and the ship plaintiffs claim to be third-party beneficiaries of these undertakings of NCB. To be a third-party beneficiary of a contract, one must be within the group of persons that the contract was intended to benefit. The members of this group depend on the intention of the parties to the contract—Hyman-Michaels and NCB.

There is no substantial evidence in this record to establish that NCB intended that its promises were to benefit anyone other than Hyman-Michaels. The evidence relative to Hyman-Michaels' intent is at best ambiguous. Diamond did state in his letter of June 1 to Michigan Foundry, of which NCB did not receive a copy, that the on hire survey was for the protection of the stevedore and that Michigan Foundry was expected to pay one-half of the cost of this survey. How-

ever, in the same letter, when Diamond discussed the A Certificate and related duties, there was no indication that part of this service. It is true, however, Michigan Foundry was to pay for any that Michigan Foundry did pay the entire cost of the A Certificate when it was billed for same by Hyman-Michaels in late August 1961.

■ The court finds that Michigan Foundry has not established by a preponderance of the evidence that it was a third-party beneficiary of the contract between NCB and Hyman-Michaels with respect to the issuance of the A Certificate and related duties or as to NCB's opinion of the character of the stowage.

The court does find and conclude that the shipowner was a third-party beneficiary of the contract between Hyman-Michaels and NCB. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).

## II

### NATIONAL CARGO BUREAU BREACHED ITS UNDER-TAKING

■ To carry out its undertaking, Captain Roscoe sent Captain Lewis to Muskegon to service the Gyda. It is true that Captain Lewis had never dealt with steel turnings before. However, according to his testimony, he had long experience as a ship's officer. He received his Unlimited American Master's License in 1946, had sailed as a Chief Mate for several years, and had been a Master of two vessels for the Moore-McCormick Lines.

Captain Roscoe testified that he instructed Lewis prior to sending him to Muskegon concerning the nature of steel turnings.

"I pointed out the Coast Guard regulations concerning this type of cargo, read them to him, explained their ability to heat, the fact that temperatures must be taken on the dock." [Tr. 857].

Roscoe also testified that he instructed Lewis concerning the standard procedure

of preparing compartments to receive turnings. Specifically, he told Lewis that the sweat battens, all loose wood, and dunnage should be removed from the compartments prior to loading. [Tr. 860].

Lewis was also instructed by Roscoe to inform the Master that turnings had a tendency to self-heat. The Master denies that Lewis ever so informed him. However, both Captain Lewis and Kis testified that Lewis did give the Master this information and the court so finds.

It is clear that Captain Roscoe fully instructed Lewis concerning his duties as to the nature of steel turnings and the hazards involved. NCB cannot be said to have been negligent or in breach of contract in sending Lewis to inspect the loading of the Gyda. The evidence does not sustain the assertion that Captain Lewis was incompetent.

Before loading began on June 14, Captain Lewis inspected the holds of the ship to determine that the sweat battens and all dunnage and debris had been removed from them as required by the Coast Guard regulations. [46 C.F.R. § 146.27–100]. He then issued a Certificate of Readiness to Load. Lewis did not require, or advise, that the wood sheathing be removed from along the bulkhead in No. 3 hold which adjoined the engine-room or from the bottom of the deep tanks.

It has been vigorously argued by Hyman-Michaels, Michigan Foundry, and the ship plaintiffs that sheathing and sweat battens are essentially the same, and therefore the regulations require the removal of both. Captain Anderson, the Deputy Chief Surveyor of the National Cargo Bureau in June 1961, testified that the maritime industry recognizes that sheathing and sweat battens are distinct items and have different uses. [Tr. 7742 to 7745, and 7905 to 7911]. Captain Anderson was a ship's officer from 1912 to 1920 and a cargo surveyor from 1920 until his retirement in 1962.

The relevant Coast Guard regulation, 46 C.F.R. § 146.27–100, reads in part as

follows: "Remove wooden sweat battens and dunnage and clean hold of debris before loading bulk shipments."

In view of the evidence presented, the court concludes that the regulations do not by implication require the removal of sheathing.

Prior to loading, Lewis, in the company of at least the First Mate, Jakobson, also took temperatures in the two piles of turnings from which the ship was to be loaded. To take these temperatures, Lewis had a crane dig several holes, each about four to six feet deep, at selected points in the piles. He and the Mate went into the depressions so created and inserted their thermometers. The temperatures thus found were around 68 to 72° F. Lewis did not take further temperatures on the dock or on the ship until after loading was concluded on June 18.

On June 14, 1961, after Lewis had completed the pre-loading portion of the draft survey, the on hire survey, had issued the Certificate of Readiness to Load, and had taken temperatures of the turnings on the dock, loading began. It continued on a 24-hour basis until June 18, when it was finished. Erickson Trucking Service provided the cranes, bulldozers, and their operators; but the work was supervised by Mr. Klein, of Michigan Foundry. Mr. Kis, of Hyman-Michaels, was also present observing the loading. Lewis told Klein not to load any hot spots. Klein, in turn, told most or all of the Erickson employees not to load steaming material or material that looked hot. They were told that such material was to be put aside and spread out to cool. The Erickson employees followed these instructions. All of these employees, except Andrews, testified that they encountered hot spots from time to time and set them aside.

There is no direct testimony that turnings with a temperature over 130° F. were loaded onto the ship. However, there is testimony by Captain Hemmick, the ship's agent, and Mr. Weiner, of Michigan Foundry, that they saw steam or vapor coming from the holds of the ship during the loading. Also, Dr. Purdy, an expert witness, testified that in his opinion 1) vapor emanating from a pile of turnings indicated a temperature of over 130° F. in the pile and 2) a temperature in No. 4 hold of 190° F. seventeen and one-half hours after loading commenced indicated that some of the material placed in that hold was over 130° F. when loaded.

On the other hand, Lorne Finlayson, another expert witness, testified that there is no necessary relation between the temperature of the turnings in the ship's hold and the temperature of the turnings on the dock seventeen and one-half hours earlier. He also testified that vapor coming from a pile of turnings does not indicate the temperature of the pile or any part thereof.

The court concludes from all the testimony that plaintiffs have not met their burden of establishing by a preponderance of the evidence that turnings with a temperature of over 130° F. on the dock were loaded into the Gyda.

While it is clear that Lewis did not take any temperatures on the ship during the period of loading, it is conceded that First Mate Jakobson took temperatures in the holds of the ship. The temperatures found are recorded at page 5 of Exhibit Jakobson–3. It is further established that Jakobson took these temperatures at the request of Captain Lewis and that Lewis had told Jakobson that if the temperatures rose above 130° F. to contact him (Lewis) at his hotel in Muskegon. Jakobson testified that he understood from Lewis that 130° F. was some kind of top limit to the Coast Guard and that danger was involved if turnings were over 130° F. On June 15, Captain Roscoe sent Lewis from Muskegon to Cleveland and from there to Buffalo. Lewis did not inform anyone of his departure or where he might be located during his absence.

It is clear from the testimony and Exhibit Jakobson–3 that the turnings soon began to heat. On the 15th, Jakobson tried several times to reach Lewis but was unsuccessful. He then prevailed

upon the Master to contact Mr. Molvig in New York, who represented the Norwegian underwriters, for advice. It is unclear what the Master was told.

In any case, the loading continued on a 24-hour per day basis until it was completed. On the 17th, the temperatures in holds 2, 3, and 4 were all over 200° F. while the deep tanks had temperatures of 156° F. and 153° F. The First Mate also continued his efforts to contact Lewis during this entire period. Indeed, on Saturday, the 17th, he went to Lewis' hotel where he learned that Lewis had left Muskegon.

Lewis testified that he boarded the Gyda on the morning of the 18th. At that time he completed the draft survey. According to the testimony of both Lewis and Jakobson, Lewis took temperatures of the cargo on the ship and was informed of the temperatures which Jakobson had found during the loading.

Following this conversation it has been established that Lewis attended a conference on the ship among the Master, ship's officers, Kis, and Hemmick. What was said at this conference is in dispute. The conflict in the testimony centers around whether Captain Lewis told the Master and those present at the conference that it was safe to sail or whether he expressed any opinion on this subject.

National Cargo Bureau was required to render an opinion as to the character of the stowage. It is clear from Wright's[7] uncontested testimony that there was no unusual amount of debris in the cargo and the court so finds. There is also no substantial evidence that borings were mixed with turnings. However, the temperatures of the cargo on the 17th and 18th were between 179° F. and 208° F. in all holds and about 156° F. in the deep tanks. [Exhibit Jakobson–3]. In view of these high temperatures, the court concludes that Captain Lewis was required to inform the representative of Hyman-Michaels that it was not safe to sail at that time. This he did not do.

From this review of the events in Muskegon, it is clear that National Cargo Bureau was in breach of its contract with Hyman-Michaels Company in several respects. The violation of National Cargo Bureau's undertaking was mainly due to Captain Roscoe's transfer of Captain Lewis from Muskegon during virtually the entire period of loading. No one from NCB was available to make periodic observations of the cargo or take temperatures of the turnings on the dock from time to time. A surveyor was not reasonably available to the representative of Hyman-Michaels during the loading in order to advise him as to whether the regulations were being complied with and whether the cargo was being stowed in a safe manner. Finally, Captain Lewis did not inform anyone on the 18th that it was not safe to sail, considering the then high temperatures in the cargo.

### III

### NATIONAL CARGO BUREAU DID NOT UNDERTAKE TO PERFORM DUTIES AS A VOLUNTEER

■ This court has already concluded that National Cargo Bureau had no contractual undertaking with reference to the cargo of steel turnings on the Gyda after it left Muskegon, the place of loading. In spite of strenuous arguments to the contrary, the court has concluded that there is insufficient evidence to support a finding that the National Cargo Bureau undertook any further duties with respect to the Gyda as a volunteer or otherwise.

It is true that Captain Sullivan was instructed by his superior, Captain Roscoe, to take temperatures on the Gyda while it was in Detroit, and if he found temperatures in excess of 130° F. to report this fact to the Coast Guard. Roscoe also testified that he felt the ship might constitute a seaway hazard if the temperatures of the turnings were over 130° F. Sullivan did as he was instructed. He took temperatures of the cargo on June 20, 21, and 22. After leaving the ship on June 20th, he reported the tempera-

----

7. Wright surveyed the cargo in Detroit at the request of Hyman-Michaels Company.

tures he found to Chief Bosun's Mate Sommer. Sullivan testified that in a subsequent conversation between himself and Captain Malloch, of the Coast Guard, Malloch asked him why he had reported the Gyda. Malloch believed that the temperatures would have to be in excess of 300° before he would be concerned. Sullivan testified he told Malloch that his orders were to report to the Coast Guard if the temperatures exceeded 130° F.

At this time it was agreed between Malloch and Sullivan that Sullivan would keep track of the temperatures on the Gyda, although Sullivan did not have to take the temperatures personally.[8] Sullivan was last on the Gyda on June 22. From that time until the ship sailed on June 29 he was informed by phone of the cargo temperatures as recorded in the ship's log each day. Sullivan, in turn, reported these temperatures to Captain Malloch.

There is no evidence in the record to indicate that Sullivan did or agreed to do anything further. There is no evidence that Sullivan advised the Coast Guard to hold the ship in Detroit or to release it, nor is there sufficient evidence that Sullivan undertook to advise the Master, or anyone else, whether it was safe to sail.

Moreover, even if Sullivan had affirmatively permitted the vessel to sail, it cannot be said on this record that such action would have been negligent. This issue is fully discussed below with regard to the Coast Guard's action in releasing the Gyda.

### IV

### THE COAST GUARD WAS NOT NEGLIGENT IN RELEASING THE SHIP IN DETROIT

■ In No. 23964, the ship plaintiffs have alleged that the Coast Guard was negligent in its action regarding the Gyda in Detroit. Basically, the ship asserts that Captain Malloch, of the United States Coast Guard, Captain of the Port

of Detroit, held the Gyda in Detroit and then negligently released the ship on June 29. The testimony as to whether the ship was held and the conditions under which it was released are in substantial conflict.

Captain Malloch testified, by deposition, that he did not remember having ever held the Gyda. However, he suffered a stroke prior to the taking of his deposition which seriously impaired his memory.

It has been established that a foreign vessel calling at a United States port is required to obtain a clearance from Customs before leaving. The ship's principal theory is that Captain Malloch asked the appropriate Customs official, Mr. Goodwin, to withhold the Gyda's clearance until the temperatures in the cargo went down.

The Customs records show that the clearance for the Gyda was issued on June 21, the day after the Gyda arrived in Detroit. Mr. Goodwin, who issued these clearances in 1961, testified that he did not remember withholding the Gyda's clearance. He testified further that he did not remember speaking with Captain Malloch or Chief Bosun's Mate Sommer or anyone else connected with the Coast Guard relative to the Gyda.

There is no indication in the ship's log that it was required to remain in Detroit either on direct order of the Coast Guard or because of its inability to obtain the required Customs clearance, nor is there any other documentary evidence to this effect.

On the other hand, James Boyle, Assistant Manager of Sealanes International, the ship's agent in Detroit, testified that he attempted to obtain the necessary clearance from Customs daily and was unable to do so. He stated that he was advised by Customs that they could not issue the clearance because of the condition of the cargo and because the Coast Guard had requested them not

---

8. It may be noted that NCB is authorized to assist the Coast Guard in administering the Dangerous Cargo Act and the regulations thereunder. 46 C.F.R. § 146.02–6a.

to issue it. At one point, Boyle testified that Goodwin asked him for temperature readings of the cargo.

In 1961, Gerry Liming was a Lieutenant JG in the Coast Guard stationed at Coast Guard District Headquarters in Cleveland. He testified by deposition and stated that he received a call from Captain Malloch in June 1961 wherein Captain Malloch asked if he had authority to detain the Gyda because of a heating condition in her cargo. Unable to answer this question on his own, he called Captain Hudson of the Coast Guard in Washington. Lt. Liming then relayed the answer received from Captain Hudson in Washington to Captain Malloch in Detroit to the effect that Malloch had such authority.

The Gyda's log shows that loading was completed in Detroit at 3:50 p. m. on June 21 and that departure was delayed because of continued heating of the turnings. The log for June 22 indicates that departure was further delayed for the same reason. On the 23rd, the ship left the pier and anchored in the stream. The log also notes that the vessel was delayed because of high temperatures and that it was awaiting further orders. Similar entries were made each day thereafter until the afternoon of the 29th when the ship sailed.

Captain Sullivan, of the National Cargo Bureau, first boarded the Gyda on June 20 shortly after its arrival in Detroit. During the time he was on the ship he took temperatures of the cargo and found them to be as high as 180° F. He testified that after leaving the ship he contacted Chief Bosun's Mate Sommer of the Coast Guard at 6:10 p. m. and informed him of the temperatures. Sommer, in turn, testified that he notified Captain Malloch about the heating problem on the Gyda and stated that Malloch told him to keep track of the temperatures. Sommer made an informal visit to the ship on the evening of June 20.

Sommer testified that the next morning, June 21, he boarded the ship and was there when Sullivan took further temperatures of the cargo. He stated that the temperatures found were as high as 170° F. and that he reported these to Malloch.

Sullivan testified that he consulted with Captain Malloch on June 22. At that time Sullivan stated that he agreed to keep the Coast Guard informed of the temperatures found on the Gyda. He said that Captain Malloch told him that it would be all right to take these temperatures from the ship's log rather than take them personally. It may be remembered that at this time the First Mate Jakobson was taking temperatures three times a day. Sullivan also said that the temperatures of the cargo were subsequently reported to him by either the Master, Kis, or the ship's agent. Things continued in this fashion until June 29.

Raymond Ballard, local counsel for the ship in this action, also testified. He stated that he was retained on June 28, 1961, by certain insurance companies having coverage on the ship and was asked to determine the status of the ship. He stated that he was soon in contact with Captain Malloch and that Malloch told him that he was holding up the Gyda's clearance because temperatures in its cargo were high and he considered them dangerous.

Ballard testified that he next contacted Captain Malloch on the morning of the 29th and at that time Malloch told him that the temperatures were coming down and that the Gyda might be permitted to sail later that day. Ballard also testified that at 3:35 p. m. on the 29th, Captain Malloch informed him that he, Captain Malloch, had approved the Gyda for sailing to Philadelphia. He also stated that at 4:00 p. m. Mr. McCarthy, of Sealanes, called him and stated that Captain Johansen was in his office to get the clearance to sail.

Captain Sullivan, of NCB, testified that he talked to the Master and Kis by phone at 3:00 p. m. on June 29, at which time he was given the temperatures of the cargo recorded that day and was informed that the ship was sailing. He stated that he then called Roscoe in Chicago to determine if he was to do any-

thing further on the Gyda before it sailed. Sullivan said that Roscoe told him that he had no further duties on the ship. After this conversation, Sullivan made the following entry in his notebook: "Called Capt. Roscoe—O.K. re sail per Cargo Bureau at 1510." [Exhibit Sullivan–5H].

The ship plaintiffs, Hyman-Michaels, and Michigan Foundry argued vigorously that this notation is strong proof that NCB did in fact hold the ship and then release it. The court rejects this interpretation of Sullivan's entry and finds that the notation was merely a record of Roscoe's statement that, in view of the Master's decision to sail, Sullivan should not be concerned further with the Gyda.

Captain Sullivan also testified that he called Captain Malloch at 3:28 p. m. on June 29 to determine "whether or not what Kis told me was true, that he [the Master] was sailing." [Tr. 3066]. He also testified that Malloch told him that the vessel was sailing; that Malloch thought the temperatures had cooled down, and that he had nothing to do with the vessel. [Tr. 3066]. Sullivan then noted in his notebook: "1528—O.K. from Captain Malloch USCG." [Exhibit Sullivan–5H].

In view of all the testimony,[9] this court has concluded that Captain Malloch did detain the Gyda and that he did this by requesting Mr. Goodwin, of Customs, to withhold delivery of the ship's clearance. The court also concludes that Captain Malloch decided to release the ship at some time prior to 3:00 p. m. on the afternoon of the 29th. The court credits Captain Sullivan's testimony that he spoke with the Master and Kis by phone at 3:00 p. m.; that they called from Sealanes' office and that Kis told him (Sullivan) that he had been in touch with the Coast Guard and they said the temperatures were down enough to sail.

The court has also concluded that Captain Malloch was not negligent in deciding to permit the ship to sail on June 29. Sullivan testified that he received the temperatures of the cargo, after June 23, from the ship's log via telephone and that he relayed these temperatures to the Coast Guard. Temperatures of the cargo were taken three times a day by the First Mate. It is agreed that the temperatures thus found are accurately recorded in Jakobson–4.

A careful examination of this exhibit indicates that the temperatures in all holds were showing a significant downward trend by June 29. It is clear that the temperatures in No. 2 hold showed a marked decrease beginning on June 26. The same is true of both deep tanks. The temperatures in No. 4 hold began to show a marked drop late on June 27. The temperatures in No. 3 hold showed some decrease on the 29th, but this decrease was not of the same magnitude as that of the other holds. Thus, it is clear that Captain Malloch was aware that there was a very marked decrease in temperatures in all holds except No. 3 and some decrease of temperatures in No. 3.

Also, while Captain Malloch did not know about Captain Meno's inspection of the cargo or the results of that inspection, Captain Meno has testified that holds 2 and 4 and the deep tanks presented no problem. After his inspection he was concerned only with hold No. 3. As to that hold, he stated that it was unstable. He testified that he had found an oil haze and generally higher temperatures in No. 3 than elsewhere. After leaving the ship at about noon on the 29th, he found that arrangements could be made at Nicholson Terminal to unload the cargo in No. 3 hold if that were desired and informed the Master of that fact when he returned to the ship early in the afternoon.

---

9. It is also significant to note that under the terms of the voyage charter [Exhibit Diamond–4, §§ 7 and 19], Hyman-Michaels was permitted 26 laytime days; that for each "day on laytime saved" Hyman-Michaels would receive a credit of $400 and would be charged a demurrage of $800 per day over the allowable maximum of 26 days.

It appears to the court that Captain Meno concluded and informed the Master that while the ship was in no *immediate* danger, and could probably sail as far as Port Weller, it would be better practice to discharge the cargo in No. 3 hold. Captain Meno also advised the Master to carry clam buckets with him if he elected to sail without unloading No. 3 hold.

In view of all this evidence, this court finds that Captain Malloch was not negligent in deciding to permit the Gyda to sail as far as Philadelphia.

V

## THE NEGLIGENCE OF THE MASTER

■ The Master testified that after sailing from Detroit, the temperature in the after-end of No. 3 hold went up and a different kind of smoke appeared. Consequently, he stopped in Montreal to have the cargo checked by a surveyor. George Hayes, a marine surveyor, representing the ship's underwriters, boarded the Gyda on July 2. Edward Edwardson, a marine engineer, who represented Hyman-Michaels and Lakes Shipping, boarded the ship at the same time.

Hayes testified that he found the wood sheathing at the after-end of No. 3 hold smouldering, and that dense smoke was coming out of No. 3 hatch. He also testified that thermometers on the engineroom side of the bulkhead adjacent to No. 3 showed readings of 180° F. to 190° F. along part of the bulkhead.

Hayes also testified in part, as follows:

"A: There was a small quantity of a white powder, which I now understand perhaps was soda ash, which was mixed with the cargo, and we tried to dig into this commodity knowing it was difficult, but at one point a small fire originated of about one foot in diameter, but it was extinguished.

"Q: You mean while you were digging into the cargo?

"A: Right.

"Q: Did you make any observation of smell?

"A: There was a very strong smell of burning wood in the after-end of that hold, burning or scorching wood." [Tr. 3136–3137].

Edwardson testified to essentially the same thing. He also observed that in view of the difference in temperatures of the starboard and port sides of the bulkhead between hold No. 3 and the engineroom, he felt they were dealing with hot spots or a hot spot in No. 3 hold. Only a part of the bulkhead was especially warm.

Hayes also stated that the Master, Edwardson, Kis, and himself agreed that the temperature of the No. 3 bulkhead had to be reduced in view of a slight buckling and that this should be done by hosing it down on No. 3 side. He said that all concerned agreed the bulkhead should be hosed every two hours. Edwardson testified to the same thing. The Master ordered that the fuel oil stored under No. 3 hold be pumped into other tanks because of his fear of an explosion.

Consequently, water was placed on the bulkhead periodically beginning July 2. On July 3, the temperature of the bulkhead was down to 120° to 135° as registered on the engineroom side. Hayes testified that all indications of smoke had vanished by that time.

On July 3, according to Hayes, there was a conference between the Master, Edwardson, Kis, the ship's agent and himself and that it was mutually agreed that "it would be prudent for the vessel to sail. * * *" [Tr. 3129]. He testified that one of the reasons he concurred in this judgment was that there were many ports of refuge on the route to Philadelphia. This testimony was corroborated by Edwardson and the First Mate Jakobson.

Hayes also testified:

"Q: From your experience as a marine surveyor, was the Master free to disregard the recommen-

dation of interest on board if he saw fit?

"A: Yes." [Tr. 3143].

The First Mate testified that after leaving Montreal, the Master ordered that water be applied to the entire cargo three times a day. He also testified that water was so applied to holds 2, 3, 4, and the deep tanks. Although the Master disputed this testimony of Jakobson, the court credits the First Mate's testimony. A review of the temperatures recorded in Exhibit Jakobson–4 demonstrates that the temperatures in the deep tanks, for example, had stabilized between 100 and 110° F. by the 29th of June. They remained at this level until July 8 when suddenly the temperature increased to 130° F. and continued to rise steadily until they got up to 210° on July 12. A similar trend is evident in holds 2 and 4. In view of this pattern of descending temperatures, stabilization, and then a very sharp and otherwise unexplained rise, the court has concluded and finds that water was applied to the entire cargo after the ship left Montreal upon orders of the Master despite repeated warnings to him that it was dangerous to do so.

The court therefore finds and concludes that the Master was guilty of negligence in (1) allowing water to be applied to No. 3 hold in Montreal, (2) in sailing from Montreal under the circumstances then existing and (3) in applying water to the cargo after the ship sailed from Montreal.

## VI

### PROXIMATE CAUSE

NCB had no right to detain the ship or require that it be unloaded. However, it did have a duty to inform Hyman-Michaels that it was not safe for the ship to sail from Muskegon and to ascertain compliance with the relevant Coast Guard regulations. This court has already determined that the regulations were obeyed. There is no sufficient evidence to establish that hot turnings were loaded onto the ship and the court has held that the 130° F. maximum in the regulations (46 C.F.R. § 146.27–100) does not apply to turnings properly on the ship.

In evaluating the causal relationship between NCB's failure to give its opinion as to the character of the stowage and the fire which occurred in Philadelphia, it is essential to examine the events in Detroit and Montreal.

Every witness who examined holds 2 and 4 and the deep tanks after the temperatures began to drop on June 27 testified that there was no difficulty with the turnings therein. The temperatures taken by the First Mate and recorded in Exhibit Jakobson–4 substantiate these observations. The temperatures in these holds stabilized at or below 130° F. between June 27 and July 3. Consequently, the cargo in holds 2 and 4 and the deep tanks was in fact safe at that time. The court finds that the application of water to the turnings on the Master's orders after the ship left Montreal renewed the heating reaction and this was the sole proximate cause of the fire which occurred in holds 2 and 4 and the deep tanks of the ship at Philadelphia.

Hyman-Michaels knew that the cargo in No. 3 hold was unstable and presented a hazard not later than June 26, the date Mr. Wright examined the cargo in Detroit at their request. The court has already found that Wright advised both Kis and the Master that the cargo would not cool on the ship.

On June 29, Captain Meno also warned the Master in Detroit that No. 3 was unstable and that it would be better practice to unload it. Meno even determined and informed the Master that arrangements could be made to unload No. 3.

In short, Hyman-Michaels and the Master knew everything in Detroit that NCB could have told them in Muskegon. The heating problem could have been remedied as easily in Detroit as in Muskegon. No one has claimed that damage was suffered in Detroit.

For these reasons, the court concludes that the breach of contract by NCB in

Muskegon was not a proximate cause of the fire in No. 3 hold in Philadelphia. NCB had undertaken only to warn or advise. Once aware of the situation, it was up to the Master and Hyman-Michaels to decide on what action to take. They did become aware of the situation in Detroit, took a calculated risk, and lost.

Even if one were to accept the argument of Hyman-Michaels and the ship that the effect of NCB's breach of contract continued beyond Detroit, the court concludes that the Master's negligence in adding water to the cargo at regular intervals at and after sailing from Montreal constituted an intervening cause and broke the previously existing chain of causation.

The Master stopped in Montreal because the wood sheathing at the after-end of No. 3 was smouldering and emitting substantial quantities of smoke. When the surveyors at Montreal attempted to disturb the surface of the cargo, a small fire originated of about a foot in diameter at one point. This fire was easily extinguished. Damage to the structure of the ship in the form of a slight buckling of the bulkhead between No. 3 hold and the engineroom was discovered, and the Master was sufficiently concerned with the dangers of explosion to order that the fuel oil stored under No. 3 hold be pumped into other tanks. Finally, he permitted water to be sprayed on the bulkhead between No. 3 and the engineroom in such a way as to get on the cargo and applied water to the entire cargo after sailing from Montreal.

The Master was informed by Grundvig in a letter received by him in Antwerp before leaving for Muskegon that turnings "is a somewhat difficult thing, because of possible fire hazard." [Exhibit Johansen–1, p. 4].

The Master testified that he knew he should not apply water to the cargo of turnings. Captain Lewis had told him of the danger of spontaneous combustion when dealing with turnings, and the Master had discussed the characteristics of turnings with Kis and Meno. The addition of water to No. 3 hold substan-tially accelerated the heating reaction of the turnings therein and led directly to the fire encountered in Philadelphia.

Hyman-Michaels and the ship plaintiffs have argued strenuously that, if the cargo had been unloaded in Montreal, much the same condition of fire would have resulted there as did result in Philadelphia two weeks later. To reach this conclusion, they have placed virtually exclusive reliance on Hayes' testimony of the small fire in the cargo.

Finlayson, an expert witness, has testified that in his opinion such a general conflagration as occurred in Philadelphia would not have taken place in Montreal. He also testified that while there might have been some fire in Montreal it could have been easily controlled. Moreover, Finlayson testified that adding water to the cargo in No. 3 would substantially accelerate the heating reaction.

The court has found that water was applied to the entire cargo after the ship left Montreal on the Master's orders as previously stated and finds that this application of water substantially accelerated the heating reaction which continued to generate further heat for about eleven days, which eventually resulted in the fire damage in question. The court therefore concludes that Hyman-Michaels and the ship plaintiffs have not met their burden of proving that a general fire would have occurred in No. 3 hold in Montreal if the turnings therein had been unloaded at that time.

The court therefore finds and concludes that no breach of duty or undertaking on the part of National Cargo Bureau was a proximate cause of the fire damage to the ship.

## VII

## CONCLUSIONS OF LAW

In view of the above findings of fact, there are few legal issues to be resolved. The court reaffirms and incorporates by reference its rulings made during the trial, including, but not limited to, the invalidity of the exculpatory clause in NCB's A Certificate, the applicability

and scope of the Ryan warranty of workmanlike service, and unavailability˜ of contribution in admiralty non-collision cases. With respect to the remaining conclusions of law, each case will be discussed separately.

No. 23990 (Skibs A/S Gylfe et al. v. Hyman-Michaels and Lakes Shipping v. National Cargo Bureau, third-party defendant).

Hyman-Michaels claims that it violated the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(6), in that it did not adequately inform the Master of the Gyda concerning the "nature and character" of steel turnings prior to loading. However, this court has found that the Master was aware of the hazard presented by steel turnings prior to loading; therefore, the Carriage of Goods by Sea Act was not violated.

Hyman-Michaels [10] also claims that the relevant Coast Guard regulations were not complied with, and it was accordingly liable to the ship for violating Section 170(7) of the Dangerous Cargo Act, which commands that the Coast Guard regulations shall be obeyed. Hyman-Michaels then claims that NCB is liable to it because NCB was hired to assure compliance with these regulations. This contention, too, has been put to rest by the court's finding that the Coast Guard regulations were complied with.

It is also argued by Hyman-Michaels that the Certificate of Readiness to Load and the A Certificate constitute deceptive shipping papers. 46 U.S.C. § 170(10). The court has concluded that neither of these documents constitutes a "shipping paper" within the meaning of Section 170(10). The term "shipping papers" is defined at 46 C.F.R. §§ 146.03–29, 146.05–12, 146.-05–13, and 146.05–14. Even if the challenged documents were shipping papers, the court has concluded that they are not deceptive. Moreover, the A Certificate was never issued until the ship was well on its way and then it was not issued to the ship, and the Master never saw it.

The court has previously determined that the Ryan warranty of workmanlike service attached to NCB's undertakings and that some of these undertakings were breached. However, this does not aid Hyman-Michaels, since this court has found that NCB's breach of its contractual undertaking was not a proximate cause of the damage suffered by the ship in Philadelphia. Hyman-Michaels' claim against NCB must fail.

No. 23991 (Skibs A/S Gylfe et al. v. Michigan Foundry v. National Cargo Bureau, third-party defendant).

Michigan Foundry alleges that it violated the Coast Guard regulations relating to the loading of steel turnings and that it is a third-party beneficiary of the contract between Hyman-Michaels and NCB. This court has found that the regulations were not violated during loading and that Michigan Foundry is not a third-party beneficiary of NCB's undertaking to insure compliance with the Coast Guard regulations and to give an opinion as to the character of the stowage. It follows that Michigan Foundry is not liable to the ship plaintiffs for violating Section 170(7) of the Dangerous Cargo Act and that it has no basis for claiming indemnity from NCB.

Michigan Foundry also claims that it was negligent and in breach of contract during the loading in that undue foreign matter and borings were loaded on the ship and that this provides a basis for recovering over against NCB. This court has already found that it has not shown by a preponderance of the evidence that undue foreign matter or debris or borings were loaded onto the Gyda.

Michigan Foundry's claim for contribution must fail as a matter of law since contribution is not available in admiralty non-collision cases. See Halcyon Lines v. Haenn Ship Ceiling & Re-

10. Hereafter, reference to Hyman-Michaels Company also includes Lakes Shipping and Trading Corp., its wholly owned subsidiary.

fitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952).

Michigan Foundry's claim against National Cargo Bureau must fail for the reasons stated above.

Admiralty No. 25386 (Skibs A/S Gylfe et al. v. National Cargo Bureau v. Hyman-Michaels Company, Lakes Shipping, Michigan Foundry, and Erickson Trucking Service, third-party defendants).

■ This court has already found that the ship was a third-party beneficiary of National Cargo Bureau's undertaking and ruled during trial that the Ryan warranty of workmanlike service applied to this undertaking. Although the undertaking was breached in Muskegon, the lack of proximate cause between this breach and the damage suffered in Philadelphia precludes recovery by the ship.

The ship plaintiffs have claimed that National Cargo Bureau is liable to it not only because of the breach of its contractual undertaking but also on the basis of negligence. The difficulty with this position is that the ship plaintiffs have been unable to establish any duties which National Cargo Bureau had with respect to the shipowner that are separate and distinct from those arising from the contract between NCB and Hyman-Michaels. Moreover, any breach of duty in Muskegon would lack the necessary causal relationship to the damages suffered by the ship for the reasons set forth earlier in this opinion. For these reasons, the ship's suit against National Cargo Bureau must fail, and consequently, NCB's third-party action against Hyman-Michaels, Lakes Shipping, Michigan Foundry, and Erickson Trucking Service must also fail.

Admiralty No. 23964 (Skibs A/S Gylfe et al. v. United States).

The central issue presented in this suit is whether the Coast Guard was required to hold the Gyda in Detroit and if so under what circumstances it could re-lease the ship. The ship plaintiffs have argued that the regulations at 33 C.F.R. §§ 6.04–8, 6.12–1 and 6.14–1 give the Coast Guard, in the person of the Captain of the Port, the right to detain any vessel "whenever it appears to him that such action is necessary in order to secure such vessel from damage * * *" (33 C.F.R. § 6.04–8).

The Government asserts that the regulations in 33 C.F.R. relied upon by the ship are not relevant in this proceeding since they were promulgated under the authority of 50 U.S.C. § 191. This section relates to the regulation of anchorage and movement of vessels during a national emergency. The Government asserts that the authority under this section can be used only to prevent sabotage and similar activities.

■ It is true that the regulations under discussion were issued in Executive Order No. 10173 of October 20, 1950, which made a finding that the security of the United States was endangered by reason of subversive activity. This executive order is still in effect. There is nothing in the statute or regulations which would support the very narrow interpretation contended for by the Government in this case.[11] The apparent purpose of Congress and of the President was to provide for the continued functioning of the ports and shipping therein during time of peril. The operation of a port and the safety of shipping in it are endangered by fire resulting from spontaneous combustion as well as by the saboteur. The court concludes that the regulations relied upon in 33 C.F.R. permit but do not require the Captain of the Port to detain a ship with hot turnings. The court also concludes that 46 U.S.C. § 170(12) and 46 C.F.R. § 146.02–6, placing the primary duty for enforcing the Dangerous Cargo Act on the Coast Guard, give the Coast Guard authority to detain a ship at least long enough to determine if the Dangerous Cargo Act has been violated.

11. Also, compare 33 C.F.R. §§ 6.04–8, 6.12–1, 6.12–3, 6.14–1, and 6.14–2 with Sections 6.16–1 and 6.16–3.

The court has found that Captain Malloch, Captain of the Port of Detroit, did, indeed, detain the Gyda. He did this by requesting Customs not to deliver the required Customs clearance to the Gyda. The court has also found that Captain Malloch released the ship on June 29 after the temperature in all holds except No. 3 had declined substantially and the temperatures in No. 3 had begun to decline. There is no statute or regulation which states how long the Coast Guard must detain a vessel once it has elected to do so. In this case, the court has found that Captain Malloch was not negligent in releasing the Gyda. Since he was not negligent in releasing the ship, and there is no regulation requiring him to hold it longer than he did, the ship's suit against the United States must fail.

The court invites the submission of any revised or additional findings of fact and conclusions of law not inconsistent with this opinion. Appropriate forms of judgment shall be presented.