The STEAMSHIP MUTUAL UNDER-
WRITING ASSOCIATION LIMITED
v.
BUREAU VERITAS.
Civ. A. No. 68–1515.

United States District Court,
E. D. Louisiana.

June 4, 1973.

Benjamin W. Yancey, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for plaintiff.

Edwin Longcope, Mark M. Jaffe, Hill, Betts, Yamaoka, Freehill & Longcope, New York City, John W. Sims, Gerard T. Gelpi, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

BOYLE, District Judge:

This is a suit by The Steamship Mutual Underwriting Association Limited (hereafter "plaintiff"), a protection and indemnity underwriter organized under the laws of Great Britain, against the Bureau Veritas (hereafter "defendant"), a society established under the laws of France and engaged in the classification of vessels in accordance with certain published standards. The suit arises from the sinking of the SS PENSACOLA on February 15, 1966, in the Caribbean Sea off the southeast shore of Hispaniola, while on a voyage from Mobile, Alabama, to Port of Spain, Trinidad. Plaintiff, insurer of the vessel for liability for loss of cargo and other protection and indemnity risks, filed suit as subrogee of the vessel owner seeking indemnity from the defendant, the classification society in which the vessel was enrolled, for amounts paid by plaintiff in settlement of cargo and other claims. Plaintiff alleges that defendant was negligent in conducting its survey of the vessel prior to the fatal voyage, resulting in the loss of the vessel and cargo. Fur-

ther, plaintiff contends that a presumption of unseaworthiness arises from the unexplained sinking of the vessel.

## FACTS

The PENSACOLA, registered under the Liberian flag, was owned by Motonaves del Este, S.A., a Panamanian corporation and managed by Southern Shipping Company, Inc. of New Orleans. Edmond H. Smith (hereafter E. Smith), was president and principal stockholder of both corporations. As managing agent for the various vessel-owning companies, Southern, represented by E. Smith, was responsible for booking cargoes, provisioning and manning the vessels and attending to drydocking and repairs. Principally in connection with the supervision of damage repairs, Smith found it necessary to retain outside surveyors.

The SS PENSACOLA (ex CARIBE) was built in 1945 by Avondale Shipyards for the U. S. Maritime Commission as one of a series of steam powered N3–S–A2 vessels constructed to a standard design. She was a welded steel, single deck, dry cargo vessel of 1897 gross and 1008 net tons, 250′ in length, 42′ 1″ in beam; her molded depth was 20′ 5″. Her summer mean draft (Salt Water) was 17′ 11¾″. When fully loaded she had a freeboard of 2′ 6¼″, and her well decks were frequently awash. The vessel had double bottom tanks beneath all four cargo holds and the engine room, and cofferdams forward and aft of the engine room. At the stern, between the after peak tank and the double bottom tanks under No. 4 hold, there was a shaft tunnel well, where there was no double bottom. This well opened into the shaft alley, which extended forward into the engine room.

The vessel was built to the specifications of the American Bureau of Shipping (ABS) and was assigned the highest class of Maltese Cross A–1 E Circle, Maltese Cross AMS. ABS records reflect that the PENSACOLA was maintained in that class by the ABS through four Special (quadrennial) Surveys, performed by the ABS between 1948 and 1961. The PENSACOLA received her last annual survey from the ABS on December 12, 1963, and was retained in class without any outstanding recommendations.[1]

In April, 1964, E. Smith elected to change the classification of the PENSACOLA and one of his other vessels from the ABS to defendant. Another of the vessels operated by Southern Shipping, the YUCATAN, was already classed with defendant and other vessels controlled by E. Smith were also subsequently enrolled with defendant. After survey by its surveyor in New Orleans, Harvey P. McNeely, on April 13, 1964, the defendant accepted the PENSACOLA for classification in a class of Maltese Cross 1 3/3L1.1. (11/61), its highest class for vessels not constructed under defendant's supervision.

The vessel had completed her last Special Survey by the ABS in November, 1961, and was due for her next Special Survey by defendant in November, 1965. However, the PENSACOLA's owner requested an extension from defendant and on December 15, 1965, defendant's surveyor at Mobile, W. S. Holmes, Jr., carried out a "superficial" examination of the vessel afloat and approximately 80% loaded at Mobile and extended the vessel's class from November 30, 1965, until January 31, 1966, subject to the vessel being submitted for full reclassification surveys by the extended date.

On January 13, 1966, the PENSACOLA arrived in a light condition at New Orleans and was placed on drydock at the Algiers Drydock and Iron Works for the quadrennial survey of hull and machinery by the defendant's surveyor, McNeely. McNeely, a licensed marine engineer and experienced independent marine surveyor, was appointed by defendant as its non-exclusive surveyor in New Orleans in 1958. Under this arrangement, McNeely billed defendant for

1. See Exhibit # 272.

his time and expenses and defendant invoiced the vessel owner. McNeely was permitted to continue to work as an independent surveyor in addition to his representation of defendant and thus, in April, 1964, he acted for the owner of the PENSACOLA and was paid separately by E. Smith for negotiating and supervising certain stranding damage repairs. In connection with the drydocking on January 13, 1966, however, McNeely attended the vessel and was paid only as a classification society surveyor.

McNeely was assisted in the inspection work by his cousin, Harry LeCourt, a retired American Bureau of Shipping surveyor. Although no records were kept of what amount of time each spent at the survey, at least one was present at all times. E. Smith attended the vessel himself rather than retain an owner's surveyor.

In the course of the drydocking and survey, the underwater body of the vessel was cleansed by "sand sweeping" and the bottom and shell plating examined and renewed where indicated. Inspection of the shell plating was visual, with hammer testing of suspect areas. No drilling or audio-gauging was performed.

The survey records reflect that deteriorated sections of F&K plates and A& B strake plating in the way of the engine room cofferdam on the starboard side were renewed with three patches, 20″ X 20″, 18″, and 20″ X 42″, of one-half inch plate. The welding around the boiler nipples on the side plating was found to be eroded and was rewelded. In addition, random seam in the way of

the fore peak tank on both sides was also renewed. The fore peak tank, after peak tank and the No. 1 double bottom tank were opened, examined internally and found satisfactory. All fuel oil and fresh water tanks were "head-tested" to defendant's rule requirements and found tight.[2] The cargo holds were examined, and all structural members, frames, beams and bulkheads found satisfactory. The vents and sounding pipes were examined and also found satisfactory. All underwater valves were opened, examined, ground in, their exterior bodies coated with Apoxier and found satisfactory. The main feed line, bilge and ballast pumps were similarly examined, tested and found adequate.

After the survey and the repairs required by the defendant were completed, the vessel was retained in class on January 21, 1966. Defendant later charged Southern Shipping $988.00 for the survey.

On January 22, 1966, the PENSACOLA, with the master as the only deck officer aboard, left the shipyard for Mobile, Alabama, to load a full cargo for Port of Spain, Trinidad. The voyage from New Orleans to Mobile was without reported incident and the vessel arrived in Mobile at 0940 hours on Sunday, January 23, 1966.

Loading was commenced the next morning, January 24, 1966, and was completed at 1700 hours on January 26, 1966, with no loading done on January 25 because of rain. Prior to the loading of any cargo, National Cargo Bureau surveyors, acting for the charterers, inspected the PENSACOLA's holds and found them to be clean, dry and fit to

2. A conflict appeared in regard to the issue of whether the tanks were tested. While McNeely testified at the trial that all tanks were head-tested, his cousin LeCourt stated in his deposition that only the fore peak, after peak and No. 1 double bottom tanks were tested. LeCourt was ill and could not testify at the trial. However, one of LeCourt's handwritten memoranda, made at the time of the survey and introduced at the trial as Exhibit # 24, stated that "[t]he following tanks were opened, examined and found in satisfactory condition. Forepeak, afterpeak, and No. 1 fuel oil tank. All tanks were then tested to rules, examined and considered satisfactory."
Apparently, LeCourt was not shown this memorandum at the time his deposition was taken. In view of this fact and the confusion at the trial over the difference between inspecting a tank and testing a tank, it seems certain that all the tanks were in fact tested.

receive cargo. The cargo loaded at Mobile consisted principally of various types of bagged meal and feed, drums of vegefat, lumber and poultry supplies. The lumber was stowed below decks in Nos. 1, 2 and 3 holds and on deck around Nos. 1, 3 and 4 hatches to a height of about 15 feet. Loading records indicate the vessel's holds were fully loaded, with cargo in excess of bale capacity having been loaded in No. 2 and No. 3 hatches.

According to the stevedores, there was more cargo booked for the vessel than the vessel could accommodate, and 2,744 bags of corn or 154 tons of cargo had to be left behind. In No. 2 hold, the last to be completed, bagged corn was stowed in the square of the hatch up to and between the hatch beams and was "walked down" by the stevedores to compress as much cargo into the hold as possible. Cargo in the after end of the hatch was stowed up between the deck beams, and the only space in No. 2 not filled with cargo was an area in the square of the hatch between the forward hatch coaming and the first hatch beam approximately 2' deep and 4' long. Upon completion, the loading of the vessel was approved by the National Cargo Bureau surveyor, who recorded the vessel's draft and issued a Certificate of Loading.

Although the vessel had completed loading at 1700 hours, sailing was delayed as the vessel awaited the arrival of a replacement for the chief engineer who had declared that he did not want to sail with the vessel. He was transferred that evening to another vessel operated by Southern Shipping, which was at Pensacola, Florida, and the chief engineer from that vessel was brought over to Mobile as a replacement, joining the PENSACOLA just prior to sailing. The vessel departed Mobile for Port of Spain at approximately 0145 hours on January 27, 1966. According to the vessel's log book for previous voyages, the sailing distance between these ports is about 1970 nautical miles and would have required a voyage of about 10 or 11 days under the then prevailing weather conditions.

Although the Permanent Certificate of Registry issued by the Republic of Liberia for the PENSACOLA called for a crew of 22, excluding the master, the vessel departing Mobile had a complement of 19 including the master who was the only deck officer aboard. The new chief engineer had two assistants, only one of whom was licensed. The vessel's log records a sailing draft of 16' 6" forward and 19' 2" aft, or a mean draft of 17' 10" (unadjusted for the fresh water allowance applicable to Mobile), indicating that although the PENSACOLA had been fully loaded, she was not over her summer mark of 17' 11¾" S.W.

From Mobile, the vessel encountered winds and seas up to force 5 on the Beaufort Scale and the radio antenna was either carried away or damaged. At 0900 hours, January 27, 1966, the day of departure, while the vessel was in the Gulf of Mexico, difficulty was experienced with the steering gear; however, repairs were effected and the rudder was rendered manageable. On January 29, 1966, at about 1830 hours, it was discovered that the shaft alley was flooding. The Coast Guard was notified and the PENSACOLA altered course for the Dry Tortugas. Subsequently, the vessel proceeded to Miami for repairs. She arrived there at about 0700 hours on February 1, 1966. At about 1100 hours on February 1, 1966, at the request of E. Smith, the vessel was boarded by Clarence O. Smith, defendant's surveyor, as well as surveyors from U. S. Salvage Association and Salvage Association, London, the former representing cargo interests and the latter the vessel's hull underwriters. E. Smith was on hand but he had retained no surveyor on behalf of the owner. There was similarly no surveyor in attendance on behalf of plaintiff, although plaintiff's claim manager testified that plaintiff would have sent its own surveyor had the owner advised plaintiff of the casualty.

The vessel's draft at the time of the boarding by C. O. Smith and the surveyors was 15' 2" forward and 18' 1" aft.

The bilges were then sounded and only a normal amount of water was found. While the surveyors could not make a general inspection of the entire ship because it was fully laden with cargo, they did conclude that the damage was confined to the shaft alley space.

Experienced underwater divers inspected the exterior keel plate in the vicinity of the shaft alley. One of the divers, Green, testified that he found a circular crack, about three to four inches in diameter, approximately two frames forward of the after peak bulkhead at the turn of the plate. According to Green, the hull had been recently painted, but there was no paint around the area of the crack, indicating to him that a keel block had been in the way of the crack at the time of painting. Green, along with the other divers, inspected the entire underwater hull and found what Green described as a poor job of cleaning the hull prior to painting. They found numerous amounts of scale from three inches to one foot in diameter. Upon checking the rust spots, they found no other leaks.

In order to effect temporary repairs the shaft alley was pumped out and a patch consisting of a piece of steel plating molded to the shape of the hull was affixed with a rubber gasket to the skin of the ship and secured inside the shaft alley by means of bolts. When grease and bilge debris were removed from the base of the shaft alley in the area of the hole it was discovered that a concrete drainage sump several inches thick had been installed in the shaft alley bilge covering the affected plate. Then, following recommendations by C. O. Smith, approximately 7 yards of concrete was poured into the bottom of the shaft alley up to the level of the deck.

After the cement box was allowed to set, it was found to be tight in all respects. (Plaintiff makes no contention that this condition or the shell plating in the shaft alley caused or contributed to the sinking). Thereafter, following repairs to the vessel's radio and repacking of the leaking steering gear telemotor on February 8, 1966, C. O. Smith, defendant's surveyor, endorsed the PENSACO-LA's certificate of classification as follows:

"Class confirmed—satisfactory temporary repairs by installation of cement box in shaft alley, subject to re-examination on drydock and permanent repairs of plate renewal within 30 days from below."

In issuing his requirement that the vessel be drydocked for inspection and permanent repair of the shaft alley plate, C. O. Smith noted in his survey report that the vessel was loaded fully with cargo and that there was no drydock available at Miami.

In the interim, on February 6, 1966, a chief mate had joined the PENSACOLA at Miami and the PENSACOLA resumed her voyage at 1855 hours on February 8, 1966. Her log reflects a departure draft of 16′ 11″ forward and 18′ 00″ aft, or a mean draft of 17′ 5½″. Enroute, the chief mate stood watch from 12–6 and the master from 6–12. Between the three engineers, four hour watches were maintained in the engine room.

The deck log reflects that after departing Miami the vessel sailed on a course nearly parallel to the northern coast of Cuba, encountering relatively rough weather with winds from the east/southeast and seas measured at force 4–5 on the Beaufort Scale. Seeking shelter from the weather, the master did not follow the shorter route along the northern coast of Hispaniola and then through the Mona Passage, south to Trinidad. Instead, the PENSACOLA transited the Windward Passage between Cuba and Hispaniola, rounded Cape Dame Marie and proceeded into the Caribbean Sea on a course almost due east along the southern coast of Hispaniola. The weather, however, did not abate materially and heading on a generally easterly course into winds of up to 25 to 30 knots and seas of 8 to 10 feet, the vessel was pounding, taking the sea over her bow, and averaging only about 6 knots.

The pitching and the rolling of the vessel during the voyage made it difficult to obtain accurate soundings of the amount of water in the bilges and, therefore, the bilges were pumped periodically as a matter of routine, at least once each day and perhaps even once each watch. On no occasion, however, was it found necessary to operate the bilge pump for more than a few minutes, nor did daily soundings indicate the presence of more than the normal amount of water. The master testified that as the vessel proceeded in heavy weather and sea, she was subject, as recorded in her log, to violent and continuous pounding, and was taking sea over her deck.

However, despite the weather and sea, during which at least two other vessels in the area issued distress calls, the PENSACOLA proceeded without reported incident until 2350 hours on February 14, 1966. At that time, the vessel was on a course of 90°, i. e., due east, at a position approximately 60 miles due south of Saona Island on the southeastern tip of Hispaniola. The master, who was on watch at this time, says that he noticed the bow was not rising in the sea as much as it had been and ordered No. 1 and No. 2 holds sounded. Approximately 5 to 6 feet of water were found in No. 2.

The master had all hands alerted, ordered distress signals sent and the life boats readied. The chief engineer, on watch in the engine room, was instructed to start the bilge pumps, and water was observed being discharged from the bilge lines. The master then ordered a course change to 343° in the direction of Saona Island, approximately 60 miles to the north.

In the interim, none of the ship's personnel, including the master, who looked into No. 2 hold, heard the inflow of water or observed anything which would indicate its source. The boatswain sounded No. 1 and No. 2 bilges about 2330 on February 14th and reported about two and one-half feet of water on the port and three feet on the star-board in No. 1 and a little over two feet on the port and over three feet on the starboard in No. 2. Thereafter he opened the manhole hatches of and looked into No. 1 and No. 2. He was able to see water in No. 2, but was unable to see water in No. 1 because of the cargo stow and heard no water coming in in either. The boatswain said the captain looked into No. 2, but not into No. 1 because he, the boatswain, told the captain No. 1 could not be seen into. The master testified that he had his men check the No. 1 hold and no water was found. Apart from the boatswain's statement, there is no evidence of flooding in any hold other than No. 2 or that water had entered any other space in the vessel including the engine room, or that any compartments other than No. 2 were ordered pumped out.

At 0005 hours, February 15, No. 2 hold was reported approximately half full of water and, at about 0040 hours, the master, fearing, he says, that the grain in No. 2 might swell and cause the ship to break apart, called the officers together, and it was decided to abandon the vessel. Therefore, at 0145 hours on February 15, 1966, the entire crew abandoned the vessel. Because of fear of an explosion the vessel's boilers were secured; however, the master testified that the lights and pumps were left running. With sea breaking over the bow, the crew left the vessel in one lifeboat and remained in the vicinity of the vessel, firing flares and awaiting assistance in response to the SOS calls which had been sent before abandonment. About 0220 hours the crew saw the vessel's lights go out. At approximately 0315 hours, February 15, 1966, a U. S. Coast Guard aircraft located the PENSACOLA, still afloat, with her lifeboat nearby at position 17′ 32″ north and 68′ 39″ west, but by 0415, February 15, 1966, another Coast Guard aircraft on the scene, advised that the PENSACOLA had gone down.

On March 31, 1966, the owners filed a petition in this Court for exoneration from or limitation of liability (Docket

No. 8105, in Admiralty, Section B). In those proceedings cargo claims in the total amount of $302,719 were filed by six different claimants. Subsequently, in July, 1968, following settlement negotiations with counsel for cargo, the alleged claims were settled for $201,384.37. Settlement was also effected with charterers in the amount of $2,368.50, with respect to claims for loss of bunkers and dunnage, and the owners were reimbursed by plaintiff for crew expenses in the amount of $5,568.21. In addition, plaintiff paid counsel fees to its attorneys. Prior to undertaking the settlement with the cargo claimants and the charterers, no notice of these claims or tender or settlement was made to defendant. However, soon after the settlement was concluded in July, 1968, with these claimants, plaintiff filed this action.

## NEGLIGENCE

■ Relying on principles of tort and/or a warranty of workmanlike performance by the defendant, plaintiff claims to be entitled to recover for the loss of the vessel and its cargo resulting from the allegedly negligent manner in which the defendant conducted the January, 1966, survey of the vessel. Plaintiff claims four specific instances of negligence by defendant in conducting the survey: (a) negligent inspection and testing of the vessel's shell plating, in violation of defendant's rule with regard to gauging of the shell plating; (b) negligent and improper inspection and testing of the vessel's tanks, in violation of defendant's rules; (c) negligent and lax internal inspection of the vessel's cargo holds, in violation of defendant's rules; (d) failure to make a complete inspection of the bottom, in violation of defendant's rules.

Defendant's surveyor McNeely conducted a visual examination of the hull and used a hammer to test suspicious areas. Plaintiff contends that under defendant's Rule 2–11(7), defendant was required to determine the condition of shell plates by drilling or non-destructive testing (gauging). Rule 2–11(7) provides:

At least once every twelve years:

. . . . . .

—the condition of the plates with regard wear and tear is to be ascertained through systematical drilling or non-destructive control of their thicknesses.

The records of the American Bureau of Shipping were admitted into evidence and failed to disclose that any systematic gauging was done while the vessel was carried on their rolls.[3] Further, McNeely testified that he did not consult any prior records of the American Bureau of Shipping.[4] While McNeely did say he had a recollection of some records on board the vessel or in the owner's possession showing the thickness of the plates,[5] his testimony as to these records is uncertain at best and indicates that he did not examine the records if there were in fact any such records. Thus we cannot help but conclude that at the time of the January, 1966, survey, McNeely did not know whether any test of the shell plate thickness had been made. The question arises whether McNeely was bound under Rule 2–11(7) to determine the thickness. While the vessel had not been on the defendant's rolls for the stated twelve years, all the facts which McNeely possessed should have indicated to him that the vessel was over twenty years old and no thickness determination had been made. To say under these circumstances that no determination would be required until the vessel had been enrolled with the defendant for twelve years would mean that the vessel would have been in service for thirty-two years before any such determination was made. Such a result seems clearly contrary to what the rule requires.

3. Exhibits # 225–272.

4. Tr. I, 61–64, 77, 78.

5. Tr. I, 62, 63.

Defendant contends that Rule 2–11(1) is the applicable rule. It provides:

> If he considers it necessary, the Surveyor may have some plates drilled to ascertain their condition with regard to wear and tear.

From an examination of the rules, it is obvious that this provision is a general provision and is not intended to relieve the defendant of the more stringent requirement of Rule 2–11(7). Further, Pillatt, an expert witness, testified that in his opinion McNeely for some reason decided to ignore the defendant's specific rules as to determining the shell plate thickness.[6] In view of these facts, we conclude that McNeely violated the specific rule for determining shell plate thickness.

Next plaintiff claims that defendant violated its own rules as to the testing and inspection of the vessel's tanks. Specifically, plaintiff contends defendant failed to follow the portion of Rule 2–11 which provides:

> The double bottom compartments, deep tanks and fuel bunkers must be emptied and cleaned to allow an internal inspection, except for those permanently used for fuel.

> \* \* \* \* \* \*

> The double bottom compartments, peak tanks, deep tanks, fuel oil bunkers, shall be separately tested under a pressure at least equal to that provided in Table 16.

> At each special survey after the second, a portion of the compartments used exclusively for the storage of fuel oil (double bottom tanks, bunkers) is to be drained and cleaned to allow an internal inspection so that all such compartments have been internally inspected, after completion of the sixth special survey.[7]

We have previously noted and discussed the conflict in testimony as to whether all tanks were tested, and there found that all the tanks were in fact "head-tested" in accordance with the rules.[8]

The situation is not quite so clear as to the inspection of the tanks. In view of the requirement that all double bottom compartments, except those permanently used for fuel, be emptied and cleaned, it is necessary to decide which tanks were "permanently used for fuel." There is no problem as to tanks No. 1 and No. 2 because No. 1 was in fact opened and inspected, and it is not disputed that No. 2 was permanently used for fuel. Hence the only problem concerns tanks No. 3 and No. 4. E. Smith testified that No. 4 was used for fuel except for "very rare exceptions" when it was used for ballast,[9] and the master stated that on this voyage that tank was used for fuel.[10] The crucial issue here is whether the term "permanently used for fuel" allows a very exceptional use for ballast. Apparently, the rationale for excepting those tanks permanently used for fuel from internal inspection is that they are not subject to deterioration when used for fuel.[11] Thus, it seems that a tank used even infrequently for material other than fuel would be subject to such deterioration and therefore would be subject to the required inspection. Viewing the matter in this respect, we conclude that the defendant breached its own rules in not inspecting tank No. 4 internally.

While it is undisputed that the No. 3 tank was used for boiler feed water, the defendant's surveyor McNeely stated that it was not inspected internally because in April of 1964 the tank was in-

---

6. Tr. I, 168.

7. While the third paragraph quoted, regarding the internal inspection of tanks used exclusively for fuel, was part of the defendant's rules and was cited by the plaintiff, there was no evidence presented in regard to this portion of the rule and apparently it was not at issue.

8. See footnote 2, supra.

9. Tr. I, 32.

10. Exhibit 427, 21.

11. Tr. I, 82.

spected as part of work done to repair grounding damage, and in his judgment no further inspection was necessary.[12] Despite the fact that these repairs had been made approximately two years previously, the specific rule should have been followed. The failure to follow this rule would mean that under normal circumstances the tank would not be inspected until the next special survey, some six years after the previous inspection and repairing. Even though this might not appear to be an excessive length of time, the rule is phrased in mandatory terms and without more justification we cannot say that the failure was excusable.

Nevertheless, it is relevant to notice that the plaintiff's theory of the sinking seems to be based on a flooding of holds No. 1 and No. 2 which are above tanks No. 1 and No. 2, but which are forward of tanks No. 3 and No. 4.[13] The conclusion is inescapable that if there were indeed breaches of the hull in either tanks No. 3 or No. 4, then water would have been present in points further to the stern of the vessel than holds No. 1 or No. 2. However, the evidence indicates presence of water in only holds Nos. 1 and 2. This fact would certainly seem to negative any theory that the sinking was caused by water entering a hole in tank No. 3 or tank No. 4.

Third, plaintiff contends that the defendant was negligent in that it violated certain of its own rules regarding the inspection of the cargo holds of the vessel. In pertinent parts, Rule 2–11 reads:

1—The holds and peaks must be cleared and properly cleaned to allow an internal inspection.

. . .

\* \* \* \* \* \*

The condition of the bulkheads and decks is to be examined by the Surveyor.

\* \* \* \* \* \*

7—At least once every twelve years: —in addition to the above, the metal structure of holds and peaks shall be cleaned and all rust removed.

Plaintiff has laid great stress on this cleaning and inspection being necessary so that the watertight integrity of the internal bulkheads could be maintained. In this respect, McNeely's uncontradicted testimony is that the holds and structures were cleaned sufficiently so that an inspection could be made, and was in fact made, to determine the condition of the bulkheads.[14] It is not entirely clear what the term removal of "all rust" entailed, or whether this action was accomplished, but apparently the rust was not meticulously cleaned from the holds. However, the examination by the National Cargo Bureau in Mobile prior to the loading of the cargo found the holds to be clean and dry. In addition, the holds had received attention at the last special survey by the American Bureau of Shipping in November, 1961.[15] Viewing all these facts, especially the fact that McNeely found the bulkheads in satisfactory condition, we cannot say there was any negligence on the part of the defendant in the inspection of the vessel's cargo holds.

Finally, the plaintiff claims that the manner in which the defendant had the vessel dry docked was negligent in that it violated Rule 2–10 requiring:

The vessel shall be put on a slipway or on blocks high enough to allow easy survey of the bottom plating and sternframe. Arrangements must be made to allow for a complete inspection of the shell plating.

In the January, 1966, survey the vessel was placed on keel blocks measuring twelve inches by twelve inches by forty-four inches and spaced approximately thirty inches apart from the center of one block to the center of the next

12. Ibid.

13. Plan of ship, Exhibit # 12.

14. Tr. I, 91–92.

15. Exhibit # 267.

block.[16] It is plaintiff's argument that this procedure resulted in a large portion of the bottom of the hull being obscured from view and thus the requirement that "a complete inspection of the shell plating" be made was not followed. As proof of the inadequateness of this method, the plaintiff points to the hole in the shaft alley which had to be repaired in Miami. The testimony indicates that apparently a keel block had been in the way of the area of the hull around the hole during the drydocking.[17] On its face, such a fact seems to lend weight to plaintiff's claim that the method of drydocking was negligent. On the other hand, McNeely insisted that no classification society requires that a vessel be moved on the keel blocks and the plaintiff never introduced proof to contradict this testimony.[18] While it is true, as plaintiff claims, that an industry cannot protect itself from liability by establishing a negligent custom, plaintiff has failed to offer any positive proof that the method of drydocking used here was negligent. It may be that another method should have been used, or it may be that this method was perfectly sound. Plaintiff had the burden of proving that the method used was negligent. The plaintiff having failed to sustain this burden, we cannot find that the method employed was negligent.

## CAUSATION

While plaintiff has shown that defendant performed the survey negligently in failing to gauge the shell plating and failing to internally inspect certain of the double bottom tanks, plaintiff has not proved that such failures caused the vessel to sink. Proof of wastage of shell plating in way of the No. 2 hold in and of itself would not have rendered the vessel unseaworthy. Proof of the degree of wastage is critical to such a determination. But negligent failure to gauge the shell plating does not establish wastage or the degree thereof or, in this case, that the sinking occurred as a result of wastage of the plating not gauged. Plaintiff has failed to show what did cause the vessel to begin to take on water in the No. 2 hold and, more importantly, whether the action of the master in abandoning the vessel was a significant cause in the sinking. What the plaintiff has shown is that the survey was negligent in certain respects, that the vessel began to take on water, was abandoned and then sank. Obviously, plaintiff seeks a presumption that the negligence of the defendant caused the sinking.

However, the evidence presented cannot justify such a presumption. Plaintiff's own expert witness, Pillatt, in testifying as to the cause of the sinking said he could only "assume" that the vessel suffered a severe leak through her hull in some unknown manner and to him it "suggested" a severe fracture.[19] In view of the witness's somewhat qualified answer, it is interesting to note that under cross examination he testified that he has known of a vessel breaking in two from a static fracture while lying alongside a dock.[20] While this statement is obviously irrelevant to the cause

16. Tr. I, 71.

17. McNeely testified (at Tr. I, 89) that the area where the hole developed could have been covered by one of the keel blocks. Green, one of the divers who repaired the hole in Miami, felt (Tr. I, 114) that a keel block must have been underneath the hole during the dry docking because all the area around the hole had been recently painted, but the area of the hole was left unpainted.

18. Tr. I, 87–88.

19. A. "Well, I would have to assume that the vessel sustained a very severe leak-age through her hull in some manner, which I don't know.

Q. Of course you were not there.

A. I was not there.

Q. But it suggests to you—I say the situation suggests to you what?

A. Well, it obviously suggests either a severe fracture or a severe, considerable size hole."

Tr. I, 151.

20. Tr. I, 166.

of the sinking of the vessel involved here, it does point up the lack of certainty of the witness's testimony and its dubious weight. It is further interesting to note that the master seemed to feel that the bad weather and failure of a weld or welds may have caused the sinking.[21]

Considerable controversy arose at the trial between the defendant's expert witness Reineke and the plaintiff's expert witness Mellis as to how many holds of the vessel could be flooded before the vessel would become unstable and sink. Reineke's testimony was somewhat confused and at one point he seemed to indicate that the vessel would remain stable even if all four holds were flooded, it being necessary that the engine room be flooded for the vessel to sink. Such a conclusion seems extraordinary, and apparently Reineke would not unequivocally state this. Mellis, on the other hand, testified that his studies showed that the vessel would remain stable with the No. 2 hold flooded, but if No. 1 was also flooded the vessel would become unstable and susceptible to sinking. Crediting Mellis' opinion would require the conclusion that the vessel was not in danger of sinking if only the No. 2 hold were flooded and the vessel were still manned. In view of the fact that the master stated that there was water only in the No. 2 hold, it becomes questionable whether the master should have abandoned the vessel. However, the master decided to abandon the vessel because he feared the grain might swell and cause the ship to crack. We do not have the evidence to decide, and are not required to decide, whether that decision was proper. The important point here is that it raises further doubt as to what actually caused the vessel to sink.

Thus it is apparent that what actually caused the vessel to take on water and sink is unknown. It may very well be that some hidden defect in the vessel's hull, which would not have been discoverable regardless of the diligence which the defendant exercised in the survey, caused a hole in the hull allowing water to enter. Plaintiff has not shown that the cause of the water entering was something which the defendant could have discovered from a proper conduct of its survey. Upon close examination of the two aspects in which the defendant's conduct of the survey was negligent, it is apparent that even if these activities had been carried out properly, a defect might have remained undiscovered. First, the manner in which the gauging is done indicates it could fail to discover some defect. Pillatt testified that systematic gauging involves the use of either two or three transverse belts of gauging and sometimes one or two longitudinal belts.[22] A transverse belt means a row of gauging of every plate and strake on the deck, down one side, across the bottom, and back up the other side to the starting point, thus a belt around the ship. The wind and water belts are longitudinal belts. One has no difficulty in seeing how such a belt could miss some defect. As to the negligence in internally inspecting the tanks, it has already been pointed out in discussing the negligence that the tanks not inspected were to the rear of any area where water was detected, thus negating any inference that this caused the entry of water.

■ In summary then, plaintiff has not shown what caused the vessel to sink. True, the vessel is gone and plaintiff cannot inspect it to determine the exact cause. Nevertheless, as we have said, plaintiff has failed to show that the sinking was caused by some defect which was discoverable by a completely adequate survey.

## LAW

■ Initially, we must decide whether the presumption of unseaworthiness can be used against the defendant. In Great American Insurance Company v. Bureau Veritas, 338 F.Supp. 999 (S.D.

---

21. Exhibit # 475, 82.

22. Tr. I, 140.

N.Y.1972) the court, at page 1009, found that "the presumption of unseaworthiness cannot be used against a classification society which did nothing more than to classify a ship that proved to be unseaworthy." That case bore more similarity to ours than only the named defendant. There the vessel had been surveyed by the defendant prior to a voyage on which the vessel sank. In deciding that the presumption of unseaworthiness should not apply against the defendant, the court placed weight on the fact that historically the presumption has been applied against those who are responsible for and in control of the vessel, thus owners or demise charterers. The court discussed In re Marine Sulphur Transport Corp., 312 F.Supp. 1081 (S.D.N.Y.1970) which extended the presumption to include a designor-convertor who negligently rebuilt a ship in an unseaworthy manner, but the court concluded that the presumption could not be extended to one merely classifying a ship. Significantly, since the *Great American Insurance* case was decided, the Second Circuit has reversed the lower court in the *Marine Sulphur* case and its application of the presumption. In re Marine Sulphur Queen, 460 F.2d 89 (2d Cir. 1972). The Second Circuit held that the duty of providing a seaworthy ship was only due by the owner of the ship, and therefore suits by seamen's representatives against the ship builder arising from the sinking of the ship were governed by traditional tort concepts. We fully agree with these cases and we hold that the plaintiff in our case cannot use a presumption of unseaworthiness against the defendant.

Denied the use of the presumption of unseaworthiness, the plaintiff must prove by a preponderance of the evidence its claim of negligence or breach of warranty of workmanlike performance by the defendant, and that those acts proximately caused the vessel to sink. *Great American Insurance*, supra, 338 F.Supp. at 1006. The plaintiff in that case was faced with much the same problem as the plaintiff in our case

since the ship was lost and obviously could not be examined. Nevertheless, the court there held that the plaintiff had failed to prove causation by a preponderance of the evidence and hence was not entitled to recover. In our case plaintiff has likewise failed to show a causal connection between any failure on the part of the defendant and the later sinking of the vessel. Despite the surface appeal of plaintiff's case, we cannot allow plaintiff to recover when it has failed to show that the sinking was caused by a defect which a proper survey by the defendant would have discovered.

Skibs A/S Gylfe v. Hyman-Michaels Co., 304 F.Supp. 1204 (E.D.Mich.1969) aff'd 438 F.2d 803 (6th Cir. 1971) involved a cargo bureau surveyor which violated certain of its own rules pertaining to a survey of cargo loading. The cargo caught fire, damaging both the cargo and ship, and among other suits, several were brought against the surveyor. The district court held in favor of the defendant surveyor, finding that its violations were not the proximate cause of the fire. The Sixth Circuit affirmed, but criticized the district court for applying tort principles to what it viewed as a contract case. The court stated that " . . . in contract theory a party who breaches a contract has its ultimate damage liability for that breach gauged by the test of foreseeability of the injury resulting therefrom." 438 F.2d at 808. However, the court still affirmed the lower court's holding because it reasoned that the later negligence of the master with regard to the cargo was unforeseeable.

In examining our case in light of the *Skibs A/S Gylfe* case, it is interesting to note that in that case there was no question as to the cause of the fire. It was without dispute that the excessive temperatures in the cargo caused the fire. However, in our case it has not been shown what caused the vessel to take on water, much less what caused it to sink. Both the question of whether some defect, undiscoverable by a proper

survey, caused the vessel to take on water, and the question of whether the vessel would have sunk had the master not ordered it abandoned were not answered by plaintiff's evidence. Perhaps the master's abandoning the vessel here was negligence and, as in the *Skibs A/S Gylfe* case, such was unforeseeable. In short, plaintiff has not shown enough as to why the vessel sank to be in a position to argue that it was a foreseeable result of the defendant's improper survey. If the plaintiff had shown that the vessel sank because of a defect that the defendant should have discovered, then plaintiff would be in a position to argue that the sinking was a foreseeable result of the failure to detect the defect.

Admittedly, the result reached does place a heavy burden on the plaintiff since the vessel has sunk. However, to lessen the plaintiff's burden would be to place the defendant more in the position of an insurer of the vessel, a situation commensurate with neither the services rendered nor the fees charged.

Therefore, in view of the foregoing reasons, there should be judgment for the defendant dismissing plaintiff's suit at its costs.