## W. F. MAGANN CORPORATION, Plaintiff,

v.

The TUG DELILAH, her engines, tackle, etc., in rem, and Bay Towing Corporation, as owner, in personam, Defendants and Third-Party Plaintiffs,

v.

UNITED STATES SALVAGE ASSOCIATION, INC., Third-Party Defendants.

Civ. A. No. 76–2–N.

United States District Court, E. D. Virginia, Norfolk Division.

July 11, 1977.

---

G. W. Birkhead, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiff.

Robert M. Hughes, III, Seawell, McCoy, Dalton, Hughes, Gore & Timms, Francis N. Crenshaw, Crenshaw, Ware & Johnson, Norfolk, Va., for defendants.

## MEMORANDUM OPINION AND JUDGMENT ORDER

CLARKE, District Judge.

This action began when plaintiff, W. F. Magann Corporation, sued the Tug DELILAH, *in rem,* and her owner, Bay Towing Corporation, *in personam,* alleging negligence and breach of contract in causing the capsize and damage of Barge JK–14 and its cargo, a crane and other equipment, the plaintiff had hired defendant to tow. The defendant, Bay Towing Corporation, subsequently filed a third party complaint against United States Salvage Association, Inc., the marine surveyor plaintiff Magann hired to fit and approve the barge and crane for tow. Plaintiff Magann then filed a cross-claim against United States Salvage.

The trial was completed on August 26, 1976, and an order of settlement between plaintiff Magann and defendant Bay Towing was entered on September 8, 1976. The case remains on the docket for decision as to third party defendant United States Salvage's liability, if any, to plaintiff Magann and defendant Bay Towing for negligence or breach of contract in fitting and approving the Barge JK–14 and its cargo for tow.

This complaint is a maritime claim within the admiralty jurisdiction of this Court, 28 U.S.C. § 1333, and within the provisions of Rule 9(h) of the Federal Rules of Civil Procedure. The case is submitted for decision on the basis of trial transcript, briefs, depositions and exhibits.

The parties have been unable to agree to more than the sketchiest of facts:

1. At all material times, the plaintiff, W. F. Magann Corporation, was a

bareboat charterer or the owner *pro hoc vice* of the Barge JK–14, and the owner of certain equipment laden thereon.

2. The defendant, Bay Towing Corporation, was owner and operator of the Tug DELILAH.

3. The defendant, United States Salvage Association, Inc., was a corporation engaged in the business of marine surveying at various ports throughout the world, including Norfolk, Virginia.

4. Magann contracted with Bay Towing to tow the barge and cargo of crane and other equipment from Norfolk to Tangier Island, Virginia.

5. Magann contracted with United States Salvage to oversee the proper securement of the barge and the tie-down of the crane and other cargo.

6. United States Salvage did supervise and approve the preparation of the barge and crane for tow.

7. On or about November 28, 1975, at approximately 1445 hours, at Norfolk, Virginia, the Tug DELILAH took the Barge JK–14 in tow for the trip to Tangier Island, Virginia.

8. The barge capsized in the early morning hours of November 29, 1975, during the course of this voyage, resulting in damage to the barge and her cargo.

Magann and Bay Towing seek to recover from United States Salvage on the basis that it negligently supervised and approved the preparation of Barge JK–14 and its cargo for towing and that it breached its warranty of workmanlike service. *Fairmont Shipping Corp. v. Chevron International Oil Comp., Inc.,* 511 F.2d 1252, 1259 (2d Cir. 1975); *Skibs A/S Gylfe v. Hyman-Michaels Comp.,* 304 F.Supp. 1204, 1222 (E.D.Mich.1969), *aff'd,* 438 F.2d 803 (6th Cir. 1971). Bay Towing admits that it had no privity with United States Salvage but claims that it may recover any damages it sustained as a result of the capsize as a third party beneficiary to the contract made by Magann and United States Salvage. *Skibs A/S Gylfe, supra* at 805.

In order to make a successful recovery, Magann and Bay Towing must prove by a preponderance of the evidence that United States Salvage proximately caused the capsize by some negligent act or omission or by breach of its warranty to perform workmanlike services. *Steamship Mutual Underwriting Assn., Ltd. v. Bureau Veritas,* 380 F.Supp. 482, 493 (E.D.La.1973); *Great American Insurance Comp. v. Bureau Veritas,* 338 F.Supp. 999, 1006 (S.D.N.Y. 1972). See *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941); and *In re Marine Sulphur Queen,* 460 F.2d 89 (2d Cir. 1972).

In order to reach a decision as to United States Salvage's liability, it is incumbent upon this Court to test the weight of the evidence by making carefully analyzed and detailed findings of fact from the testimony and exhibits presented at trial.

There have been two "causes of capsize" theories seriously pursued by Magann and Bay Towing throughout the trial and the post-trial briefs:

1. That defendant United States Salvage negligently secured the hatch covers to two forward tanks on the barge so that they became dislodged, the tanks filled with water, the barge tipped forward and to starboard due to the water weight, and the barge and cargo capsized.

2. That United States Salvage negligently secured the crane with restraints inadequate to withstand the stress and strain encountered during the voyage, the crane broke loose and toppled or moved forward, the bow tipped forward and to starboard under the weight of the moving crane, and the barge and crane capsized.

There has also been speculation that the capsize was caused by a large wake from a passing vessel or by use of a short towing hawser coupled with high speed and a sharp turn by the tug.

It appears to the Court that the evidence presented establishes the following facts with regard to the towing conditions the night of the capsize, securement of the Barge JK–14, and the tie-down of the crane.

## FINDING OF FACTS
### Towing Conditions

The waves encountered during the trip were less than twelve inches high. The crew of the DELILAH except on one occasion avoided possible large wakes from passing ships by traveling three miles from the shipping lane of deep-draft ships and by alerting passing ships of the tug and tow's presence. On one occasion before the barge was discovered to be in a capsized condition, the tug and tow did encounter a wake of a passing ship sufficient to throw the captain of the tug, who was off duty, out of his bunk or to at least seriously jostle him while he was in his bunk. The tug and tow moved along at about six knots until a short time prior to the capsize, when it was slowed considerably by a change in the current or by virtue of the barge taking on water or both. The crew from time to time attempted to keep a watch on the tow by checking it with binoculars without the use of the tug's searchlight. After dark, the crew attempted to determine from the lights on the crane and on the bow of the barge that everything was in order. However, they could not see the tow in detail and failed to shine a searchlight on it. They reported noticing no increased wave action, ships' wakes nor a list to port or starboard of the tow, in short, nothing unusual right up to the time of the capsize which was described as a sudden jerk and an abrupt stop. The Court does find, however, that the flotilla did encounter one substantial wake from a passing vessel.

### Securement of the Barge JK–14

The DELILAH towed the barge with a two hundred foot hawser connected to a V-shaped bridle extended thirty-five feet to attach to port and starboard bitts on the barge. Although there was testimony that the hawser was shorter than normally used and that a sharp turn could cause the bow of the barge to plow under water, there was no evidence that the tug made such a sharp turn or that any other mishap occurred due to the use of the two hundred foot hawser. At any rate, if the capsize resulted from the short hawser, coupled with the one substantial ship's wake or by itself, liability would remain on Bay Towing rather than United States Salvage for towing the barge in a negligent manner.

There were eight hatch covers on the surface of the barge. They were screwed flush into the deck and covered with strongbacks bolted onto the deck with a height of seven inches above the deck. The crevices around the hatch covers were then sealed with hot tar. When the barge was recovered and righted, two forward hatch covers were missing. Two of. plaintiff Magann's expert witnesses testified on the basis of this fact that the covers must have been torn off prior to capsize, allowing the forward tanks to fill with water and ultimately causing the whole barge to tip and capsize. It was explained that a dry barge would have to tip. 67° in order to capsize while a barge flooded in its forward tanks would turn over when tipped to an angle of only 47°. These experts were convinced that in the face of the evidence of calm seas and without the shift of weight caused by water filled forward tanks, the overturning moment of barge and crane could not arrive. However, the subsequent evidence did not bear out these witnesses' testimony that the missing hatch covers caused the capsize. The bridles were apparently attached in such a way that it would have been impossible for them to have fouled the hatch covers and strongbacks. In addition, even assuming that the covers were torn away, there was no evidence that under normal cruising conditions with one foot seas any water except spray from the wake of the tug ran across the bow of the barge and this was agreed to be insufficient water to fill the tanks. The Court concludes that even though one substantial wake from a passing ship was encountered there was no

persuasive evidence that this wake would have torn away the hatch covers and their securing devices or that if the hatches were open would have filled the hatches to the extent that the bow would have lowered sufficiently so that the barge started taking on water through the open hatches.

In the preparation of the barge for its voyage, United States Salvage required that luminous stripes be painted on the side of the barge at the bow. The purpose of this was to allow the pilot of the tug to shine his searchlight on the side of the barge at the bow. The luminous paint would reflect the light and the pilot could thereby tell if the barge was maintaining its proper freeboard (height from water to deck) or was settling in the water. If the pilot failed to see some or all of the paint stripes he would know that the barge was taking on water and was settling.

After requiring that the stripes be painted on the hull, United States Salvage neglected to call this to the attention of the tug's captain. United States Salvage's representative admitted that he should have done so. (Blackburn T. 485).

While the Court has no doubt that such failure on the part of Blackburn constituted negligence, the Court having not been persuaded by the evidence that the capsizing was caused in whole or in part by the vessel's taking on water, the Court cannot find that such negligence was a proximate cause of the disaster.

### Tie-Down of the Crane

United States Salvage admitted that it did not make calculations to insure that the tie-down used to secure the crane to the Barge JK–14 was sufficient to withstand any resistance that might be normally expected in a trip across the Chesapeake Bay. However, it stated that the tie-down accomplished in this case was done according to experience gained from fitting and approving many prior tow trips made across the Bay without mishap and during inclement weather and much worse towing conditions.

The crane was set on sixteen inch high wooden mats called swamp mats. The cabin, boom and tracks were mechanically locked into place by locks incorporated within the crane itself with the boom lowered to approximately a 30° angle. Guy wires were shackled to the boom and stretched to padeyes on the forward port and starboard sides of the barge with a slight strain. The counterweight located behind the cabin was blocked up and then chained to deck padeyes. It was testified that the tie-down system of the boom and counterweight was designed to prevent a rocking or bouncing motion. The tracks of the crane were toenailed to the swamp mats by chocks or large blocks of wood wedged against the tracks forward and aft and held by eight inch spikes driven through the block into the swamp mat. It was testified that the purpose of this procedure was to keep the crane from going forward or aft. The major part of the tie-down of the crane was accomplished by passing cable through the tracks of the crane from port to starboard at the front and at the back of the crane. In detail, the cable used was seven-eighths of an inch in diameter, its bitter ends were clamped together by cable clamps to create a continuous loop like a rubber band at each end of the crane, the port side loop of the cable passed around a thimble or grooved ring which was shackled to a steamboat ratchet which was welded to the deck to hold the line taut, the cable passed through holes in the pads of the crane tracks to the starboard side where the starboard loop of the band or cable passed around another thimble shackled to a padeye which was welded to the deck.

The breaking strength of the seven-eighths inch wire cable was computed by United States Salvage's expert to be 34.6 tons. Bay Towing's expert testified that the breaking strength of the cable was 27.3 long tons (2240 lbs. in each ton) or 32 short tons. Dr. Weese, Dean of the Old Dominion University School of Engineering, settled the question as to the strength of the doubled cable with an enlightening demonstration which indicated that the tie-down system effected approximately 1.6 cable strength for each set of double cables. Us-

ing United States Salvage's expert's figures as to the strength of the individual cable, the total effective breaking strength of the forward and aft sets of doubled wires was 110 tons. Using Bay Towing's expert's long ton figures, it was 88 tons (102 tons utilizing his short ton measure). United States Salvage did not contest Bay Towing's figures that the resistance to be secured amounted to 68.2 tons and that the 45° angle of the cables from the crane to the deck of the barge increased the resistance or load to 80 tons. It appears then, that even accepting as true all the figures of Bay Towing (88 tons breaking strength at the minimum, 80 tons to be resisted at the maximum), United States Salvage adequately tied down the crane against the weight of its resistance. In addition, the Court notes that Bay Towing's expert, Captain Harry A. Clark, testified that he thought the crane broke away from inadequate restraining cables but that he had no knowledge of what forces could have been present to cause the break during the calm tow. Indeed, there was no testimony of forces which could have jarred or put the crane into motion other than a bouncing boom and as shown by the facts above, the tie-down of the boom and counterweight was effected to protect against this motion.

Plaintiff Magann suggests that the crane tipped forward due to the tie-down strain on the boom and the blocking up of the counterweight and thereby put the full weight of the crane against only one set of doubled cables or 44 or 55 tons restraining force. Plaintiff contends that in that way the crane could have broken loose, slid forward and tipped and capsized the barge.

The Court is unimpressed with this argument. As recited above, the strain on the boom was slight, just strong enough to keep it from bouncing up and down. In addition, the blocked up counterweight was chained to the deck of the barge to prevent it from bouncing up and down. There was also testimony that the barge itself was a foot higher forward than aft and that, therefore, the crane would tip backwards or slide off the mats sideways before it could possibly move forward; that had the crane

moved forward on the barge under the tie-down arrangement, the boom would have become bent and buckled which was not the case; that the damaged starboard swamp mats, forward spud well and missing forward hatch covers indicated that when the crane went off the barge, whether as a cause of the capsize or as the result, it went off the forward starboard side and not the bow; and finally, that there were no critical marks or indentures evidencing the fall of a sixty-ton crane from sixteen inch mats to the one-half inch thick deck of the barge. The Court also notes that there was some evidence that the crane could ride safely across the Bay without any restraints at all and that while in working operation, the crane could move to any edge of the barge and not cause a capsize.

A summary of these facts, United States Salvage's previous experience in surveying and fitting tows in the same manner as this tow for trips across the Bay in weather far worse than the case here without mishap, use of a cable tie-down mathematically calculated as sufficient to restrain the crane, a boom and counterweight carefully secured against motion, tracks chocked with large blocks of wood to prevent forward and aft motion, and the lack of evidence of a force which could have foreseeably put the crane in motion so as to break loose from the restraints provided, causes this Court to conclude that neither Magann nor Bay towing have proved by a preponderance of the evidence that United States Salvage was guilty of negligence or that it breached any contractual obligation to Magann. The Court might add that all of the parties presented expert testimony in support of their respective positions. Except as to specific findings of fact as set forth herein, the Court found one no more persuasive than another.

## CONCLUSIONS OF LAW

The Court, on the basis of its interpretation of *Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941) and its

progeny and on the holdings in *Mutual Underwriting Assn., Ltd. v. Bureau Veritas,* 380 F.Supp. 482, 493 (E.D.La.1973) and *Great American Insurance Comp. v. Bureau Veritas,* 338 F.Supp. 999, 1006 (S.D.N.Y. 1972) places on Magann and Bay Towing the burden of proving by a preponderance of the evidence that United States Salvage acted to proximately cause the capsize of the Barge JK–14 and cargo.

In *Commercial Molasses,* a shipper sued a carrier for damages caused when the barge of molasses being towed by the carrier sank in smooth water without contact with any other vessel or external object. The Court held that the burden of proving a breach of the carriage contract or of negligence by the carrier was on the shipper. The Court said that the shipper or claimant could make a prima facie case by simply establishing the loss of his goods and that the carrier, because he was in a better position than the shipper to know the cause of the loss and to show that the cause was one not involving his own liability, had a duty to come forward with information concerning the loss or suffer the possibility of an inference of liability against him. However, the Court also stated that if the trier of fact was left uncertain as to the cause of the loss, the shipper or claimant had not met his burden of proof and could not recover a verdict. This holding was echoed in *Hampton Roads Carrier, Inc. v. Allied Chemical Corp.,* 329 F.2d 387 (4th Cir. 1964) where a carrier sued a shipper in a counterclaim for negligently loading the tow so as to cause it to sink. The Court held that the carrier had the burden of proving the shipper's negligence and that the lower court was not clearly in error for finding that the carrier had failed to prove that the loading was negligent and a cause of the sinking. *Hampton Roads, supra* at 392.

*Steamship Mutual Underwriting Assn., Ltd. v. Bureau Veritas,* 380 F.Supp. 482, 493 (E.D.La.1973) and *Great American Insurance Comp. v. Bureau Veritas,* 338 F.Supp. 999, 1006 (S.D.N.Y.1972) specifically involved a survey company defendant like United States Salvage. Bureau Veritas was sued for performing the inspections and surveys of the vessel it was hired to survey negligently and in breach of its warranties of workmanlike service thereby making itself liable for the sinking of the ship. The Courts in these two cases held that because the survey company was not responsible for the vessel as an owner or builder and not in control of the vessel as a carrier or demise charter, no inferences or presumptions of its liability could arise and that the plaintiff must prove its claim of the survey company's negligence or breach of warranty of workmanlike performance by a preponderance of the evidence. The Courts made findings that although it was proved that the defendant Bureau Veritas okayed the vessels without testing the hull of one ship and without directing that a minor leak in another ship be repaired, the claimants had failed to prove by a preponderance of the evidence that the defendant had proximately caused the casualties on which the cases were based.

On the basis of these cases and on the facts found heretofore, the Court concludes that the plaintiffs must prove their claims by a preponderance of the evidence and further, the Court is not persuaded that a preponderance of the evidence proves any of the theories of Magann and Bay Towing drawn to establish liability on the part of United States Salvage. The Court is of the opinion that United States Salvage was negligent in not informing the crew members of the DELILAH of the use of luminous strips painted at the water line of the barge. However, there was no evidence that this negligence proximately caused the casualty. Indeed, the Court is of the opinion that the evidence does not show by a preponderance what did occur to cause the Barge JK–14 and crane to capsize. Therefore, the Court does not find the third party defendant, United States Salvage Association, Inc., liable for negligence or breach of contract to perform workmanlike service in fitting and approving the Barge JK–14 for tow.

Judgment is entered for the third party defendant, United States Salvage Association, Inc.